Haji BISMULLAH a/k/a Haji
Bismillah, and a/k/a Haji
Besmella,

Haji Mohammad Wali, next friend
of Haji Bismullah, Petitioners

v.

Robert M. GATES, Secretary
of Defense, Respondent.

Huzaifa Parhat, et al., Petitioners

v.

Robert M. Gates, Secretary of Defense,
et al., Respondents.

Nos. 06–1197, 06–1397.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 15, 2007.

Decided July 20, 2007.

As Amended Oct. 23, 2007.

Jeffrey I. Lang argued the cause for petitioners Haji Bismullah, et al. Sabin

Willett argued the cause for petitioners Huzaifa Parhat, et al. With them on the briefs were Rheba Rutkowski, Neil G. McGaraghan, Jason S. Pinney, Susan B. Manning, John B. Missing, Jennifer R. Cowan, and Jill van Berg.

Douglas N. Letter, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were Peter D. Keisler, Assistant Attorney General, Gregory G. Katsas, Principal Deputy Associate Attorney General, Jonathan F. Cohn, Deputy Assistant Attorney General, and Robert M. Loeb and August E. Flentje, Attorneys.

Before: GINSBURG, Chief Judge, and HENDERSON and ROGERS, Circuit Judges.

Opinion for the court filed by Chief Judge GINSBURG.

Concurring opinion filed by Circuit Judge ROGERS.

GINSBURG, Chief Judge:

Petitioners are eight men detained at the Naval Station at Guantánamo Bay, Cuba. Each petitioner seeks review of the determination by a Combatant Status Review Tribunal (CSRT or Tribunal) that he is an "enemy combatant." In this opinion we address the various procedural motions the parties have filed to govern our review of the merits of the detainees' petitions. The petitioners as a group and the Government each propose the court enter a protective order to govern such matters as access to and handling of classified information; the petitioners move to compel discovery and for the appointment of a special master; and the Government asks the court to treat the seven petitioners who filed the joint petition in *Parhat v. Gates* (No. 06–1397) as though each had filed a separate petition to review his status determination.

▮ In order to review a Tribunal's determination that, based upon a preponderance of the evidence, a detainee is an enemy combatant, the court must have access to all the information available to the Tribunal. We therefore hold that, contrary to the position of the Government, the record on review consists of all the information a Tribunal is authorized to obtain and consider, pursuant to the procedures specified by the Secretary of Defense, hereinafter referred to as Government Information and defined by the Secretary of the Navy as "such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant," which includes any information presented to the Tribunal by the detainee or his Personal Representative.

In addition, we must implement such measures to govern these proceedings as are necessary to enable us to engage in meaningful review of the record as defined above. Therefore, we will enter a protective order adopting a presumption, as proposed by the petitioners, that counsel for a detainee has a "need to know" the classified information relating to his client's case, except that the Government may withhold from counsel, but not from the court, certain highly sensitive information. The protective order also will provide that the Government may inspect correspondence from counsel to a detainee, including "legal mail," and redact anything that does not pertain to the events leading up to the detainee's capture and culminating in the conduct of his CSRT, including such events in between as bear upon the decision of the Tribunal or our review thereof. Finally, the protective order will provide that a lawyer offering his or her services may, as the petitioners propose, have up to two visits with a detainee in order to obtain the detainee's authorization to seek

review of the CSRT's determination of his status.

Before entering the protective order, the court will give the parties an opportunity to suggest changes.

## I. Background

Each petitioner is a foreign national captured abroad and held at Guantánamo, seeking review of a decision of a CSRT determining that he is an "enemy combatant" and therefore subject to detention for the duration of hostilities. Haji Bismullah was captured in Afghanistan in 2003. Huzaifa Parhat and the six other detainees joining his petition are ethnic Uighurs who allege they were captured in Pakistan in approximately December 2001.

## A. The Regulations

In a July 2004 Memorandum for the Secretary of the Navy, the Secretary of Defense established skeletal procedures for the conduct of CSRT proceedings with respect to foreign nationals held at Guantánamo to "review the detainee's status as an enemy combatant." The Secretary of the Navy, who was "appointed to operate and oversee [the CSRT] process," promptly issued a memorandum specifying detailed procedures (Navy Memorandum), which are still in effect.*

Pursuant to those procedures, a CSRT reviews the determination, made after "multiple levels of review by military officers and officials of the Department of Defense," (E–1 § B) that a detainee is an "enemy combatant," defined as "an individual who was part of or supporting Taliban or Al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." (E–1 § B) A Tribunal is composed of "three neutral commissioned officers" who were not involved in the "apprehension, detention, interrogation, or previous determination of status of the detainee[ ]." (E–1 § C(1)) The Tribunal is to "determine whether the preponderance of the evidence supports the conclusion that each detainee meets the criteria to be designated as an enemy combatant." (E–1 § B) There is a rebuttable presumption that the Government Evidence, defined as "such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant" (E–1 § H(4)) is "genuine and accurate" (E–1 § G(11)).

The Tribunal is authorized to request the production of "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant," (E–1 § E(3)) and the Recorder, a military officer, is charged with obtaining from government agencies and reviewing all such Government Information (E–2 § C(1)). The Recorder must present, orally or in documentary form (E–2 § C(6)), both the Government Evidence and, if any there be in the Government Information, all "evidence to suggest that the detainee should not be designated as an enemy combatant." (E–1 § H(4), E–2 § B(1)) In advance of the Tribunal hearing, the Recorder must prepare an unclassified summary of the relevant Government Information and provide the summary to the detainee's Personal Representative, also a military officer. (E–2 § C(2), (4))

Each detainee's Personal Representative reviews the Government Evidence the Recorder plans to present to the Tribunal (E–3 § C(3)), has access to the Government Information (E–3 § C(2)), and meets with the detainee to explain the CSRT process. The Personal Representative

---

* The Secretary of the Navy attached to his memorandum three "enclosures," to which we refer below in our citations to the CSRT procedures as "E–1," "E–2," and "E–3."

may not, however, share classified information with the detainee. (E–3 § C(4)) The Personal Representative "shall present information to the Tribunal if the detainee so requests" and "may, outside the presence of the detainee, comment upon classified information submitted by the Recorder." (E–3 § C(5)) The detainee may testify or introduce relevant documentary evidence at the hearing, but may not be compelled to answer questions. (E–1 § F(6)-(7)) He also may present the testimony of any witness who is "reasonably available and whose testimony is considered by the Tribunal to be relevant." (E–1 § F(6))

After the hearing, the Recorder compiles a "Record of Proceedings," consisting of (1) a statement of the time and place of the hearing and the names of those present; (2) the Tribunal Decision Report cover sheet,* which is accompanied by (a) the classified and unclassified reports made by the Recorder "upon which the Tribunal decision was based" and (b) copies of all documentary evidence presented to the CSRT; (3) a summary prepared by the Recorder of each witness's testimony; and (4) the summary report written by any dissenting member of the Tribunal. (E–2 § C(8), E–1 § G(12))

Each Tribunal has a "Legal Advisor" with whom the members may consult regarding legal, evidentiary, procedural, and like matters. (E–1 § C(4)) The Legal Advisor reviews for legal sufficiency both the CSRT's rulings on whether witnesses and evidence are reasonably available and its ultimate determination of the detainee's status. (E–1 § I(7)) The Legal Advisor forwards the Record of Proceedings to the "Director, CSRT," (E–1 § I(5)) who reviews the decision as well. (E–1 § I(8), E–2 § C(10)) If approved by the Director,

CSRT, then the decision becomes final. (E–1 § I(8))

## B. The Statutes

In December 2005 the President signed into law the Detainee Treatment Act (DTA), Pub.L. No. 109–148, § 1005(e)(2)(A), 119 Stat. 2742–43, which vests in this court exclusive jurisdiction "to determine the validity of any final decision of a [CSRT] that an alien is properly detained as an enemy combatant." Section 1005(e)(2)(C) of the Act provides:

> The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit on any claims with respect to an alien under this paragraph shall be limited to the consideration of—
>
> (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence); and
>
> (ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States.

Soon after arriving at Guantánamo, many a detainee, either personally or through a "next friend" acting on his behalf, sought release by filing a petition for a writ of habeas corpus in the district court. Beginning in January 2006, after the DTA was enacted, some detainees, in-

---

\* A Tribunal member designated by the Tribunal President (E–1 § H(9)) must "document the Tribunal's decision on the [CSRT] Report cover sheet ... which [serves] as the basis for the Recorder's preparation of the Tribunal record."

cluding the petitioners, filed in this court petitions seeking both review of a status determination by a CSRT and a writ of habeas corpus. *See, e.g., Paracha v. Gates,* No. 06–1038. In October 2006 the Congress passed and the President signed into law the Military Commissions Act (MCA), Pub.L. No. 109–366, § 7, 120 Stat. 2635–36, which stripped the district court of jurisdiction over habeas petitions filed by or on behalf of "an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." MCA § 7(a), 28 U.S.C. § 2241(e)(1). Meanwhile, we had stayed the petitions filed in the court of appeals, including those of Bismullah and the Parhat Petitioners, pending this court's decision in *Boumediene v. Bush,* 476 F.3d 981, 990–91, *cert. denied,* —— U.S. ——, 127 S.Ct. 1478, 167 L.Ed.2d 578, *cert. granted,* —— U.S. ——, 127 S.Ct. 3078, —— L.Ed.2d —— (2007). In that case we held that, because the common law writ of "habeas corpus would not have been available in 1789 to aliens without presence or property within the United States," the Congress did not violate the Suspension Clause of the Constitution, U.S. Const. art. I, § 9, cl. 2, when it stripped the federal district court of jurisdiction to hear any habeas petition filed by "an alien detained by the United States." We now take up the motions pending in the petitioners' DTA cases.

## C. The Motions

In order to resolve preliminary issues before this court reviews the merits of their claims, all the petitioners filed motions to (1) enter the protective order previously entered by the district court in all habeas cases brought by Guantánamo detainees (Status Quo Order); (2) compel discovery, allowing the petitioners to gather all evidence available to the Government at the time the CSRT was held and to present to the court such evidence as was not presented to the CSRT; and (3) appoint a special master to hold hearings and make factual findings, as necessary to address disputes arising from the proposed protective and discovery orders. In his motion to compel discovery, Bismullah also seeks counsel access to (1) the Record of Proceedings (classified and unclassified) before his CSRT; (2) the Government Information regarding Bismullah; (3) any statements or letters in support of Bismullah; (4) other documents relating to Bismullah's CSRT, including "records, notes, memoranda and correspondence of the Tribunal members, Recorder, Personal Representative, or other person who participated in Bismullah's CSRT"; and (5) other "reasonably available documents or information in the possession of the U.S. government" bearing upon whether Bismullah meets the criteria to be designated an enemy combatant.

In their motion to compel discovery, the Parhat Petitioners seek counsel access to (1) the CSRT records (classified and unclassified) for all seven Parhat Petitioners and for 13 other Uighur men allegedly taken into custody at the same time and place; (2) records created in Kandahar, Afghanistan or Guantánamo regarding any Parhat Petitioner's status as an enemy combatant; (3) records of the State Department's effort to persuade foreign governments to grant asylum to any of the 20 Uighurs, including the Parhat Petitioners; (4) the Government's files regarding interrogation of each Parhat Petitioner; (5) records concerning the conduct of the Recorder in all CSRT proceedings concerning any of the Parhat Petitioners; (6) records concerning any visit to Guantánamo of any official of the People's Republic of China in order to interrogate any Uighur detainee, upon which interrogation the petitioners are concerned the Tribunal may have relied in designating them enemy combat-

ants; and (7) records concerning any Parhat Petitioner's affiliation with the East Turkistan Islamic Movement, which the Government designated a "terrorist organization" pursuant to 8 U.S.C. § 1182(a)(3)(B)(vi)(II) more than two years after the Parhat Petitioners allege they were captured, *see* 69 Fed.Reg. 23,555 (2004), and with which the Parhat Petitioners allege, in apparent anticipation of the Government Evidence, they have no affiliation.

For its part, the Government moves the court to enter a substantially revised version of the protective order entered by the district court (Government's Proposed Order), before the entry of which it apparently refuses to turn over to counsel for the petitioners any classified information and "any information designated by the Government as protected information." The Government also proposes the court treat the petition filed by the seven Parhat Petitioners as seven separate petitions.

## II. Analysis

The parties fundamentally disagree about what constitutes the record to which this court must look as it reviews a CSRT's determination that a petitioner is an enemy combatant. The parties agree that the court should enter a protective order before the Government gives counsel for the petitioners (all of whom have the requisite security clearance) access to classified and protected information, and that the protective order must provide a method for counsel to communicate to a detainee nonclassified but confidential information, in writing and in person. The parties disagree, however, over several particulars. The petitioners ask the court to enter the protective order entered by the district court in the aforementioned habeas cases, and the Government proposes a substantially different order.

### A. The Record

The petitioners argue the court must look beyond the Record of Proceedings and consider all evidence reasonably available to the Government, which may include evidence neither the Recorder nor the detainee's Personal Representative nor the detainee put before the CSRT. In addition, they point out that many of the procedures specified by the Department of Defense for the conduct of a CSRT address steps to be taken before the hearing, and argue that therefore the court must have available to it information sufficient to enable review of a detainee's claim that the Government did not comply with a pre-hearing procedure. For example, Bismullah contends, on information and belief, that the Recorder for his proceeding failed to gather and examine potentially exculpatory evidence and to present that evidence to the Tribunal. Bismullah also alleges the Tribunal acted arbitrarily and capriciously by, for example, ruling that Bismullah's brother was not "reasonably available" to testify or submit an affidavit. The Parhat Petitioners similarly allege the Recorder failed to present the Tribunal with statements made by military interrogators advising them as early as 2003 that they soon would be released. The Parhat Petitioners also seek information regarding other Uighur detainees in order to support their claims that the Government acted arbitrarily by finding the Parhat Petitioners to be enemy combatants while finding similarly situated detainees were not enemy combatants. Finally, the petitioners contend that, even if the court does not review the Government's compliance with pre-hearing procedures, they are entitled to discovery directed at determining whether exculpatory material was withheld from the Tribunal.

The petitioners propose not only to compel discovery but also to supplement the record with such evidence as they discover

relevant to their claims. As counsel for the petitioners said at oral argument, their request is "not strictly speaking for discovery [but] for the court to have the complete record before it." Here they rely upon *NRDC v. Train*, 519 F.2d 287, 291–92 (D.C.Cir.1975), in which we held that after the plaintiffs made a "substantial showing" that the EPA had not filed with the court the entire administrative record of the matter under review, they were "entitled to an opportunity to determine, by limited discovery, whether any other documents which [were] properly part of the administrative record had been withheld." Thus, the petitioners contend the court appropriately considers supplemental extra-record information when the "procedural validity of the [agency's] decision" is "under scrutiny," *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989), because, for example, the agency excluded documents that might have been adverse to its decision, *see Kent County, Del. Levy Court v. EPA*, 963 F.2d 391, 395–96 (D.C.Cir. 1992).

The Government's position is that the record before the court is properly limited to the Record of Proceedings, as compiled by the Recorder. According to the Government, the plurality in *Hamdi v. Rumsfeld*, 542 U.S. 507, 538, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004), "rejected free-wheeling discovery" for even a citizen detained as an alleged enemy combatant as long as there was a formal military proceeding "akin" to a CSRT in which the detainee could present his version of the facts. The Government believes that by directing this court to "determine the validity of any final decision of a Combatant Status Review Tribunal," DTA § 1005(e)(2)(A), the Congress intended to "evoke[ ] this Court's familiar function of reviewing a final administrative decision based upon the record before the agency." In support of that position and the lack of any need for discovery, the Government contends the Record of Proceedings is sufficient for meaningful review by the court, because a ruling on the reasonable availability of a witness or of evidence must be made on the record; the Personal Representative's communication to the detainee is largely scripted, leaving no need to produce "[his] notes, memoranda and correspondence"; and the actions of the Recorder, whose task is routine and subject to a strong "presumption of regularity," is subject to challenge by the detainee, who may testify on his own behalf, and by the detainee's Personal Representative, who may review the Government Information.

We approach questions concerning the content of the record we are to review mindful that the DTA directs this court to "determine the validity" of a Tribunal's "status determination" with particular reference to whether it was made "consistent with the standards and procedures specified by the Secretary of Defense, ... including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence." DTA § 1005(e)(2). As the petitioners point out, many of the procedures specified by the Secretary relate to steps the Recorder and others must take before the Tribunal holds a hearing. In order to review compliance with those procedures, the court must be able to view the Government Information with the aid of counsel for both parties; a detainee's counsel who has seen only the subset of the Government Information presented to the Tribunal is in no position to aid the court. There is simply no other way for the counsel to present an argument that the Recorder withheld exculpatory evidence from the Tribunal in violation of the specified procedures. Even if the Recorder's actions are entitled to a presumption of regularity, as the Government maintains—but which is not at all clear because a CSRT does not have the transparent features of the ordinary ad-

ministrative process and the Recorder is not the final agency decisionmaker, *see* *Martino v. U.S. Dep't of Agric.*, 801 F.2d 1410, 1412–13 (D.C.Cir.1986)—that presumption is not irrebuttable,* *see, e.g.*, *NRDC v. SEC*, 606 F.2d 1031, 1049 n.23 (D.C.Cir.1979) (listing methods of rebutting presumption of regularity); but it would be irrebuttable, in effect, if neither petitioners' counsel nor the court could ever look behind the presumption to the actual facts. In addition, the court cannot, as the DTA charges us, consider whether a preponderance of the evidence supports the Tribunal's status determination without seeing all the evidence, any more than one can tell whether a fraction is more or less than one half by looking only at the numerator and not at the denominator.

The petitioners argue that once counsel have seen the Government Information relative to a particular detainee, they may need discovery in order to ensure "the Government has actually collected all [documents it is required to collect]." They believe, that is, they may be able to make a particularized showing of need for specific documents in addition to those obtained by the Recorder.

■ We deny the petitioners' motions to compel discovery, without prejudice to renewal, because they have not made a showing sufficient to justify compelling discovery at this stage of these proceedings. First, the petitioners do not need discovery in order to challenge a CSRT's ruling that a requested witness or item of evidence was not "reasonably available"; as the Government points out, that ruling must be made on the record, which should be sufficient to determine whether the Tribunal acted in accordance with the specified procedures. Nor does a detainee petitioner need information regarding the conduct of another detainee's CSRT proceeding. Such information is not relevant to our review, and therefore not necessary for a counsel's representation of his detainee client; the Act authorizes this court to "determine the validity of any final decision of a [CSRT]," DTA § 1005(e)(2)(A), and our jurisdiction under the Act is expressly "limited to the consideration of" whether a detainee's status determination was "consistent with the standards and procedures specified by the Secretary of Defense for [a CSRT]," including the requirement that the Tribunal's status determination be supported by a preponderance of the evidence, DTA § 1005(e)(2)(C)(i). The Act does not authorize this court to determine whether a status determination is arbitrary and capricious because, to use the petitioners' example, it is inconsistent with the status determination of another detainee who was detained under similar circumstances. If a preponderance of the evidence in the record—broadly understood to include the Government Information and not just the Government Evidence, plus any evidence submitted by the detainee or his Personal Representative—supports the Tribunal's finding, then the Tribunal's status determination must be upheld, provided, of course, the determination was otherwise made in accordance with the "standards and procedures specified by the Secretary of Defense." DTA § 1005(e)(2)(C)(i).

* Insofar as the task of gathering Government Information was performed by someone other than the Recorder, Decl. of Rear Admiral (Retired) James M. McGarrah ¶¶ 4–6 (May 31, 2007), as our concurring colleague points out may have happened, or the Recorder has failed altogether to gather certain Government Information, as Bismullah alleges, a panel reviewing the merits of a CSRT status determination will be in a position to resolve whether the procedure followed was "consistent with the standards and procedures specified by the Secretary of Defense for [a CSRT]." DTA § 1005(e)(2)(C)(i).

## B. The Protective Order

Pursuant to the All Writs Act, 28 U.S.C. § 1651, which authorizes the court to issue "all writs necessary or appropriate in aid of [its] jurisdiction[ ]," we shall enter a protective order resolving the points in contention between the parties in such a way as to ensure the parties do not frustrate the court's ability to review a CSRT determination under the DTA. *Cf. Telecom. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75–76 (D.C.Cir.1984) (holding pursuant to All Writs Act that court of appeals "may resolve claims of unreasonable delay [by agency] in order to protect its future jurisdiction" to review final agency action). The order we enter, following an opportunity for the parties to suggest changes, will be the order proposed by the Government, as modified to conform to this opinion.

### 1. Counsel Access to Classified Information

The Government proposes to turn over to counsel for a petitioner only information that was presented to the CSRT and that "the Government has determined petitioners' counsel has a 'need to know,'" which in practice the Government anticipates will mean turning over all the Government Information with limited exceptions for information that pertains to anyone other than the detainee, highly sensitive information, and information pertaining to a highly sensitive source. Such highly sensitive information, which the Government represents will rarely be found and redacted, would be made available to the court ex parte and in camera in the event the detainee seeks judicial review of his status determination.

Petitioners' counsel, each of whom has a security clearance, contend they have a "need to know" all information about their clients' cases and related cases in order effectively to participate in the adversarial process of review in court. Petitioners argue that ex parte and in camera review of highly sensitive classified information, as the Government proposes, is not an adequate substitute for the judgment of counsel in identifying exculpatory evidence and evidence that the Tribunal, the Recorder, or the Personal Representative failed to comply with the procedures specified for the conduct of a CSRT.

We think it clear that this court cannot discharge its responsibility under the DTA, particularly its responsibility to determine whether a preponderance of the evidence supports the Tribunal's determination, unless a petitioner's counsel has access to as much as is practical of the classified information regarding his client. Counsel simply cannot argue, nor can the court determine, whether a preponderance of the evidence supports the Tribunal's status determination without seeing all the evidence. Therefore, we presume counsel for a detainee has a "need to know" all Government Information concerning his client, not just the portions of the Government Information presented to the Tribunal.

That presumption is overcome to the extent the Government seeks to withhold from counsel highly sensitive information, or information pertaining to a highly sensitive source or to anyone other than the detainee but presents such evidence to the court ex parte and in camera. Therefore, as required in the Status Quo Order, except for good cause shown, the Government shall provide notice to counsel for the petitioners on the same day it files such information ex parte. The court does not require the Government to disclose such information to counsel because, consistent with our rule of deference, "[i]t is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the

courts to second-guess executive judgments made in furtherance of that branch's proper role." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 932 (D.C.Cir.2003); *Stillman v. CIA,* 319 F.3d 546, 548 (D.C.Cir.2003) ("Precisely because it is often difficult for a court to review the classification of national security information, '[w]e anticipate that in camera review of affidavits, followed if necessary by further judicial inquiry, will be the norm' ").

■ The Government also proposes unilaterally to determine whether information is "protected," meaning that petitioners' counsel must keep it confidential and file under seal any document containing such information. For example, the Government would designate as "protected" information "reasonably expected to increase the threat of injury or harm to any person" and information already designated by the Government to be "For Official Use Only" or "Law Enforcement Sensitive."

It is the court, not the Government, that has discretion to seal a judicial record, *cf. United States v. El–Sayegh,* 131 F.3d 158, 160 (D.C.Cir.1997) ("The decision whether to seal a judicial record is ... committed to the discretion of the district court"), which the public ordinarily has the right to inspect and copy, *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Therefore, insofar as a party seeks to file with the court nonclassified information the Government believes should be "protected," the Government must give the court a basis for withholding it from public view.

### 2. Counsel Access to Detainees

Both the Status Quo Order and the Government's Proposed Order define "legal mail" as correspondence between a detainee and his counsel with respect to subjects properly within the scope of counsel's representation. The parties do not disagree about the rules governing mail sent by a detainee to his counsel, but they do disagree about how mail from counsel to the detainee client should be handled and about the scope of counsel's representation under the DTA.

Under both proposed Orders, a Privilege Team composed of Department of Defense personnel would open an envelope labeled as legal mail and addressed to a detainee. Under the Status Quo Order, the Privilege Team would search legal mail only for contraband, such as staples, paper clips, or other nonpaper items; under the Government's Proposed Order, however, legal mail would be searched for prohibited content, that is, anything outside the scope of the attorney's representation (of which more below). The Government's Proposed Order also would limit "legal mail" to:

documents and drafts of documents that are intended for filing in this action and correspondence directly related to those documents that—

i. are directly related to the litigation of this [DTA] action [and]

ii. address only (a) those events leading up to this detainee's capture or (b) the conduct of the CSRT proceeding relating to this detainee[,]

thereby implicitly but effectively limiting the scope of counsel's representation to the DTA action. The Government's Proposed Order also would expressly prohibit counsel from communicating any information outside the scope of their representation.

The petitioners object to this regime, first pointing out that under the Status Quo Order, counsel have long been prohibited from telling a detainee about:

ongoing or completed military intelligence, security, or law enforcement operations, investigations, or arrests ... or current political events in any country that are not directly related to counsel's representation of that detainee.

Because their counsel have never breached this provision, the petitioners claim the Government does not need to screen for content any legal mail their counsel might send them. The Government responds that while the Status Quo Order was in effect, some counsel—though the Government does not suggest counsel for the present petitioners—did use legal mail to inform their clients about prohibited subjects, including military operations in Iraq, terrorist attacks, Hezbollah's attack upon Israel, and the abuse at Abu Ghraib prison. The Government asserts such information can "incite detainees to violence" or cause "unrest," such as a riot, hunger strike, or suicide—as, indeed, it has done in the past.

At the least, the petitioners contend, counsel may legitimately represent the detainees in efforts to find alternate ways of ending their detention, including diplomatic means, and therefore must be able to correspond with the detainees regarding such alternatives; for example, they might want to correspond concerning which countries are suitable for seeking asylum. Using nonlegal mail is not a good alternative to using legal mail, they say, because it is very slow and heavily redacted. Moreover, the petitioners assert the attorney-client privilege, which is intended to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice," *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) (internal quotation marks omitted), applies to the communications between counsel and the detainees.

■ Without expressing any view as to whether the attorney-client privilege applies in this context, we must agree that "full and frank communication" between a detainee and his counsel will help counsel present the detainee's case to the court, and thereby aid the process of review with which we have been charged by the Congress. Regrettably, however, we cannot disagree with the Government that past breaches of the Status Quo Order by some counsel for detainees justify the Government's proposal to narrow the topics about which all counsel may correspond with a detainee and to hold all counsel accountable by screening the legal mail they send to their detainee clients.

Relatedly, we agree with the Government that the scope of representation authorized by the DTA is limited, in the words of the Act, to the pursuit of judicial review to "determine the validity of any final decision of a [CSRT]." We read the Government's proposal, however, to limit the content of the correspondence between petitioners and their counsel to "those events leading up to this detainee's capture" and the "conduct of the CSRT proceeding relating to this detainee," so as to include events occurring between the detainee's capture and his CSRT hearing, such as the claim of at least three of the Parhat Petitioners that they were told by military personnel as early as 2003 they would be released. This is necessary to enable counsel to follow such leads as his client can provide regarding exculpatory evidence that might be "reasonably available," but which the Recorder nonetheless failed to "obtain and examine."

In the protective order to be issued, we will include the Government's proposal to allow a Privilege Team, composed of personnel from the Department of Defense, to review legal mail in order to ensure counsel's correspondence does not include content outside the scope of the previous paragraph. The proposed procedure protects the confidentiality of communications between counsel and the detainee by providing that the Privilege Team may not

disclose the content of a communication to anyone unless counsel for a detainee seeks court intervention to prevent the Privilege Team from screening or redacting information sent to the detainee, in which event the Privilege Team "may disclose the material at issue to a Special Litigation Team [in the Department of Justice and] . . . to the Commander [at Guantánamo] or his representatives, including attorneys for the Government." The Special Litigation Team, none of whose members may litigate the merits of a petition brought by a detainee, represents the Privilege Team in any dispute over screened or redacted information.

### 3. Attorney Access to Prospective Clients

The Government refuses to give counsel access to classified information or to the legal mail system until counsel provides "written evidence" that a detainee has personally authorized counsel to represent him, even when a next friend purports to act on behalf of a detainee. To that end, the Government proposes to allow a lawyer one visit to Guantánamo to meet with a potential detainee client for up to a total of eight hours in which to obtain the detainee's authorization to pursue a petition for review of the detainee's status determination. The Government asserts the eight-hour limit is needed to prevent an "unwieldy and unworkable situation," apparently referring to the burden upon the base administration of accommodating numerous visits by lawyers to meet with potential clients.

The Government believes a detainee's personal authorization is "strongly [to be] preferred" because a putative next friend probably does not satisfy the requirements for standing. See Whitmore v. Arkansas, 495 U.S. 149, 163, 165, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (holding in habeas action "next friend" who is "truly dedicated to the best interests of the person on whose behalf he seeks to litigate" has

standing to act on behalf of prisoner who is "unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability"). For one thing, each detainee has been notified of his right to seek review under the DTA. In addition, some detainees, according to the Government, "revel in their status as enemies of the United States" and should be allowed to choose not to participate in a DTA action.

The petitioners' counsel object to the eight-hour limit upon their effort to persuade a detainee to pursue an action under the DTA because, they say, the detainees are so distrustful that it can take longer than that to persuade one to engage counsel. They propose that a lawyer be allowed to visit a detainee as a potential client twice, for an unspecified period of time, as has been allowed until now under the Status Quo Order.

■ We conclude the requirement of the Status Quo Order that a lawyer "provide evidence of . . . authority to represent the detainee . . . after the conclusion of a second visit with the detainee" is reasonable in that it allows the lawyer time to earn the detainee's trust and to discuss whether the detainee wants to file a petition for judicial review. The Government has not shown that two visits rather than one will harm its interests or overburden its resources. On the contrary, the Government itself has allowed that a detainee represented by counsel should not be limited to three visits with retained counsel—as the Government had first proposed in this case—because, based upon an evaluation of the "resources and needs at Guantanamo" by Rear Admiral Harry B. Harris, Commander of the Joint Task Force–Guantánamo, the Government determined such a limitation "is no longer warranted." Though the Government asserts its proposed one visit/eight-hour limitation upon

meetings between a lawyer and a potential client is still "warranted and appropriate in light of the operations" at Guantánamo, it has made no showing that a lawyer's additional visit to see a potential client imposes any greater burden upon it than does a lawyer's additional visit to a client he or she already represents.

Counsel for Bismullah, who represent Bismullah's putative next friend, maintain they need present only "evidence of ... authority to represent the detainee," rather than the Government's proposed consent form bearing the detainee's signature. They argue that requiring counsel to produce evidence both that a detainee authorizes counsel to act on his behalf and that he authorizes the filing of a petition submitted by a detainee's next friend would, in effect, "eliminate next friend cases" by requiring "that each next friend action become a direct action."

In *Whitmore*, the Supreme Court concluded that the Congress, in enacting 28 U.S.C. § 2242 ("Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf"), had codified the historic practice of allowing a "next friend" to file a petition for habeas corpus on behalf of a prisoner. 495 U.S. at 162–63, 110 S.Ct. 1717. Therefore, when the Congress later authorized this court to review the status determination of a CSRT upon the basis of a claim brought "by or on behalf of an alien [detainee]," DTA § 1005(e)(2)(B), we understand it to have permitted a next friend to petition for review of a CSRT determination when the detainee is "unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability." *Whitmore*, 495 U.S. at 165, 110 S.Ct. 1717. Hence, we reject the Government's proposal to require a detainee personally to authorize a next friend to act on his behalf when a petitioner asserting next friend standing can demonstrate the detainee is under such a disability. After two visits between a lawyer and a detainee, either the lawyer should be able to obtain the detainee's express authorization to represent him in a DTA action or the would-be next friend should be able to obtain, through the lawyer, evidence of the detainee's disability and best interests sufficient to perfect the next friend's standing. *See id.* We reject the Government's proposal to require that the detainee sign a form authorizing the filing of the petition submitted by a putative next friend; the inquiry into whether a would-be next friend has standing is necessarily a matter to be determined case by case.

4. Miscellaneous

■ We do not believe it necessary to appoint a special master to hold hearings, order discovery, or make factual findings because we have resolved the pending procedural disputes between the parties. We therefore deny without prejudice the petitioners' motion to appoint a special master.

■ The Government's motion that the court consider separately the claims jointly filed by the seven detainee petitioners in *Parhat v. Gates* is granted. In order to evaluate the merits of each Parhat Petitioner's claims, we must review a separate record of that petitioner's status determination. Accordingly, each Parhat Petitioner will be assigned a separate case number and each case will be separately briefed and assigned to a merits panel, absent further order of this court, *see Handbook of Practice and Internal Procedures, United States Court of Appeals for the District of Columbia Circuit* §§ V.A. ("[C]ases involving ... the same, similar, or related issues, may be consolidated"), III.H. (2007); Fed R.App. P. 3(b).

### III. Conclusion

We conclude the record on review consists of the Government Information, that is, all "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." We grant in part and deny in part, as explained in this opinion, both the petitioners' and the Government's motions for a protective order; deny without prejudice the petitioners' motions for discovery and for the appointment of a special master; and grant the Government's motion separately to consider the claims brought by each of the petitioners in *Parhat v. Gates,* No. 06–1397.

The Clerk of the Court will enter in each of these cases a Protective Order consistent with the foregoing opinion and assign a separate docket number to each Parhat Petitioner.

*So ordered.*

ROGERS, Circuit Judge, concurring:

Today the court sets forth the procedures to be applied in actions under the Detainee Treatment Act of 2005, Pub.L. No. 109–148, Div. A, tit. X, 119 Stat. 2739 ("DTA") by detainees who wish to challenge the classification decision of a Combatant Status Review Tribunal ("CSRT"). I offer two observations that emphasize the unique nature of DTA actions.

First, the court sets two limitations on the attorney-client relationship. For reasons of national security, the court authorizes the inspection of legal mail. Op. at 180, 189–90. That mail, in turn, is restricted in substance to matters "directly related" to this court's limited scope of review under the DTA. DTA § 1005(e)(2)(C); *see* 28 U.S.C. § 2241(e)(2); Op. at 189–90. Ordinarily, legal mail is not screened for content by federal prison officials, *see* 28 C.F.R. §§ 540.18, 540.19, and a prison warden "may not ask the attorney to state the subject matter of [an] ... interview," *id.* § 543.13(d). However, the posture of these cases and the questionable applicability of constitutional norms, *see Boumediene v. Bush,* 476 F.3d 981, 1011 (D.C.Cir.) (Rogers, J., dissenting), *cert. granted,* —— U.S. ——, 127 S.Ct. 3078, —— L.Ed.2d —— (2007), add complexities. The attorney-client privilege has a common-law basis, *see, e.g., In re Lindsey,* 158 F.3d 1263, 1266 (D.C.Cir.1998) (per curiam), but the Constitution has been used in various cases to enforce attorney access. *See, e.g., Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir.1995); *Bieregu v. Reno,* 59 F.3d 1445, 1459 (3d Cir.1995); *Clutchette v. Rushen,* 770 F.2d 1469, 1471 (9th Cir.1985); *United States v. Noriega,* 752 F.Supp. 1032, 1033 (S.D.Fla.1990). Regardless, zealous advocacy is needed in order to inform the court and to carry out Congress's grant of review in the DTA. The court has adopted a pragmatic balance of the needs of the court and the needs of national security as determined by the Executive, to whom the court defers. *See* Op. at 187–88; *see also id.* at 189–90. However, nothing in the opinion would foreclose restoration of the full attorney-client relationship were the Executive to determine that national security no longer requires such restrictions in DTA actions or were the detainees to be in a position to invoke the jurisdiction of this court beyond the limited scope of the DTA.

Second, the court has defined the scope of the record in terms of the plain text of the DTA and the Department of Defense's CSRT procedures. *See* Op. at 185–86. Because the court's review is for "a preponderance of the evidence," DTA § 1005(e)(2)(C)(i), the record before this court will consist of "all the information a [CSRT] is authorized to obtain and consider, pursuant to the procedures specified by the Secretary of Defense," Op. at 180. To

the extent this court's DTA powers are intended to check the substance of CSRT determinations, the CSRT record for review will be only a partial record. It is incomplete for at least two reasons—and possibly a third.

1. Although a detainee has the power to request the consideration of evidence he may have on-hand and testimony of "reasonably available" witnesses, he must develop this rebuttal without knowledge of the classified information that forms the case against him. He also must do so without the benefit of counsel. Nonetheless, the detainee bears the burden of proving that he is not an "enemy combatant," a term that has proven to have an elastic nature. *See Boumediene,* 476 F.3d at 1011 n. 14 (Rogers, J., dissenting); *In re Guantanamo Detainee Cases,* 355 F.Supp.2d 443, 468–72, 474–75 (D.D.C. 2005).

2. The "Government Information" consists only of "such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." Op. at 180 (quoting Memorandum from Gordon England, Secretary of the Navy, Regarding Implementation of CSRT Procedures for Enemy Combatants at Guantanamo Bay Naval Base, Cuba, encl. 1, § E(3) (hereinafter CSRT Procedures)); *cf.* Protective Order § 2.I. Thus, the initial record is limited by unilateral decisions of the Executive. If there are documents in the possession of the U.S. Government that were not gathered by the Recorder and considered by the CSRT, then the only recourse for a detainee is to seek the documents from the Executive as part of the DTA action and, upon obtaining them, to seek a new CSRT. Disputes about what

qualifies as "reasonably available," already a key point of contention, *see, e.g.,* Bismullah Petition for Release and Other Relief ¶¶ 165–68, 175; Pet'rs' Joint Br. in Support of Pending Motions at 23, cannot be decided today.

3. The gap between Congress's aspirations for the DTA and the Executive's implementation of the CSRT procedures for compiling the record, which has come to light during briefing in this case, presents new questions that also cannot be resolved today. The Executive initially asserted a curious entitlement to a "strong presumption of regularity" much as is received by an administrative agency subject to the requirements of the Administrative Procedure Act. *See* Corrected Br. of Resp'ts Addressing Pending Preliminary Motions at 66–68; Op. at 185–86. Then, in a post-argument submission of June 1, 2007, offering to "assist the Court in understanding the process of developing the CSRT record," the Executive acknowledged that it has not utilized the procedure for compiling the CSRT record that the Department of Defense specified in its publicly-announced procedures for conducting CSRTs. *See* Mot. for Leave to File Decl. Describing Process of Compiling CSRT Record (June 1, 2007); Decl. of Rear Admiral (Retired) James M. McGarrah (May 31, 2007).[1] In particular, "due to the other extensive responsibilities of the Recorder," McGarrah Decl. ¶ 4, since September 1, 2004, the Department of Defense has construed its own requirement that "the Recorder shall obtain and examine the Government Information," CSRT Procedures encl. 2, § C(1), to permit the evidence to be sorted and assessed not by the Recorder, who must be "a commissioned officer serving in the grade of O–3

---

1. *See also* Pet'rs' Joint Mot. for Leave to File Decl. of Lt. Col. Ste[ph]en Abraham (June 22, 2007); Decl. of Stephen Abraham (June 15,

2007) (attesting to command influence and departures from procedures in compiling CSRT records).

or above, preferably a judge advocate, appointed by the Director, CSRT," *id.* encl. 1, § C(2), but rather by a "Case Writer," who "received approximately two weeks of training," McGarrah Decl. ¶ 5.

Inasmuch as the DTA was designed to "legitimiz[e], through congressional action, what the Administration has done at Guantanamo Bay," 151 Cong. Rec. S11073 (Oct. 5, 2005) (statement of Sen. Graham), the Executive's belated revelation regarding the record used for CSRT proceedings is unsettling. As relevant, it leaves undetermined whether the court will be in a position to conduct the substantive evaluation, as the DTA directs, of whether a challenged CSRT determination is supported by a preponderance of the evidence, *see* DTA § 1005(e)(2)(C)(i). The Executive has previously argued to this court that the CSRT process in the DTA was designed as an adequate replacement for the writ of habeas corpus, *see* Supplemental Br. of the Federal Parties Addressing the Detainee Treatment Act of 2005, at 49–53, *Boumediene v. Bush*, 476 F.3d 981 (2007). Revelations that evidence is summarized by an anonymous "research, collection, and coordination team," McGarrah Decl. ¶ 4, whose activities have left "some of the[ ] electronic files … corrupted," *id.* ¶ 16, reinforce concerns about the adequacy of actions under the DTA as a substitute for the writ of habeas corpus. *See Boumediene*, 476 F.3d at 1004–07 (Rogers, J., dissenting).

### *PROTECTIVE ORDER*

This matter comes before the court upon the parties' motions for a protective order to prevent the unauthorized disclosure or dissemination of classified national security information and other protected information that may be reviewed by, made available to, or is otherwise in the possession of, the Petitioner or Petitioner's Counsel in this case, and upon the Government's motion to amend the initial Protective Order.

Pursuant to the general supervisory authority of the court, and for good cause shown,

IT IS **ORDERED:**

### 1. General Provisions

A. The court finds that this case involves classified national security information or documents, the storage, handling and control of which require special security precautions, and access to which requires a security clearance and a "need to know." This case may also involve other protected information or documents, the storage, handling and control of which may require special precautions in order to protect the security of United States personnel and facilities, and other significant interests.

B. The purpose of this Protective Order is to establish the procedures that must be followed by a Petitioner, Petitioner's Counsel, and all other individuals who receive access to classified information or documents, or other protected information or documents, in connection with this case, including the Department of Defense (DoD) Privilege Team.

C. The procedures set forth in this Protective Order will apply to all aspects of this case, and may be modified by further order of the court sua sponte or upon application by any party. The court will retain continuing jurisdiction to enforce or modify the terms of this Order.

D. Nothing in this Order is intended to or does preclude the use of classified information by the Government as otherwise authorized by law outside of this action under the Detainee Treatment Act.

E. Petitioner's Counsel of record is responsible for advising his or her part-

ners, associates, and employees, the Petitioner, and others of the contents of this Protective Order, as appropriate or needed.

F. All documents marked as classified, and information contained therein, remain classified unless the documents bear a clear indication that they have been declassified or determined to be unclassified by the agency or department that is the original classification authority of the document or of the information contained therein.

G. Any violation of this Protective Order may result in a sanction for contempt.

## 2. Designation of Court Security Officer

The court designates Christine E. Gunning as Court Security Officer ("CSO") for these cases, and Jennifer H. Campbell, Erin E. Hogarty, Joan B. Kennedy, Charline A. DaSilva, Nathaniel A. Johnson, Daniel O. Hartenstine, Michael P. Macisso, James P. Londergan, Barbara J. Russell and Miguel A. Ferrer as Alternate CSOs, for the purpose of providing security arrangements necessary to protect from unauthorized disclosure any classified documents or information, or protected documents or information, to be made available in connection with these cases. Petitioners' Counsel must seek guidance from the CSO with regard to appropriate storage, handling, transmittal, and use of classified documents or information.

## 3. Definitions

A. "Detainee" means an alien detained by the DoD as an alleged enemy combatant at the U.S. Naval Base at Guantánamo Bay, Cuba.

B. "Petitioner" means a Detainee or a "next friend" acting on his behalf.

C. "Petitioner's Counsel" includes a lawyer who is employed or retained by or on behalf of a Detainee for purposes of representing the Detainee in this litigation, as well as co-counsel, interpreters, translators, paralegals, investigators, and all other personnel or support staff employed or engaged to assist in this litigation.

D. As used herein, the words "documents" and "information" include, but are not limited to, all written or printed matter of any kind, formal or informal, including originals, conforming copies and non-conforming copies (whether different from the original by reason of notation made on such copies or otherwise), and further include, but are not limited to:

i. papers, correspondence, memoranda, notes, letters, reports, summaries, photographs, maps, charts, graphs, interoffice and intraoffice communications, notations of any sort concerning conversations, meetings, or other communications, bulletins, teletypes, telegrams, telefacsimiles, invoices, worksheets; and drafts, alterations, modifications, changes and amendments of any kind thereto;

ii. graphic or oral records or representations of any kind, including, but not limited to, photographs, charts, graphs, microfiche, microfilm, videotapes, sound recordings of any kind, and motion pictures;

iii. electronic, mechanical or electric records of any kind, including, but not limited to, tapes, cassettes, disks, recordings, electronic mail, films, typewriter ribbons, word processing or other computer tapes or disks, and all manner of electronic data processing storage; and

iv. information acquired orally.

E. The terms "classified documents" and "classified information" refer to:

i. any document or information that has been classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document;

ii. any document or information, regardless of its physical characteristics, now or formerly in the possession of a private party that has been derived from United States Government information that was classified, regardless of whether such document or information has subsequently been classified by the Government pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)";

iii. oral or nondocumentary classified information known to the Petitioner or Petitioner's Counsel; or

iv. any document or information as to which the Petitioner or Petitioner's Counsel has been notified orally or in writing that such document or information contains classified information.

F. The terms "protected documents" and "protected information" refer to any document or information deemed by the court, either upon application by the Government or sua sponte, to require special precautions in storage, handling, and control, in order to protect the security of United States Government personnel or facilities, or other significant government interests.

G. "Access to classified information" and "access to protected information" mean having access to, reviewing, reading, learning, or otherwise coming to know in any manner any classified information or protected information.

F. "Communication" means all forms of communication between Petitioner's Counsel and a Detainee, including oral, written, electronic, or by any other means.

I. "Legal Mail" consists only of documents and drafts of documents that are intended for filing in this action and correspondence directly related to those documents that-

i. relate directly to the litigation of this action;

ii. address only (a) events leading up to the capture of the Detainee on whose behalf the petition in this action was filed, (b) events occurring between such Detainee's capture and any hearing before a Combatant Status Review Tribunal (CSRT) relating to such Detainee, and (c) the conduct of the CSRT proceeding relating to such Detainee; and

iii. do not include any of the following information, in any form, unless directly related to the litigation of this action:

a. information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency;

b. information relating to current political events in any country;

c. information relating to security procedures at the Guantánamo Naval Base (including names of

United States Government personnel and the layout of camp facilities) or the status of other Detainees;

d. publications, articles, reports, or other such material including newspaper and other media articles, pamphlets, brochures, and publications by nongovernmental or advocacy organizations, or any descriptions of such material.

J. The "Record on Review" means the information defined as "Government Information" by the Secretary of the Navy in his memorandum regarding "Implementation of Combatant Status Review Tribunal Procedures" dated July 29, 2004, to wit, all "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant."

K. "Secure area" means a physical facility accredited or approved for the storage, handling, and control of classified information.

**4. Roles and Functions of the DoD Privilege Team and Special Litigation Team**

A. The "DoD Privilege Team" comprises one or more DoD attorneys and one or more intelligence or law enforcement personnel. If required, the DoD Privilege Team may include interpreters/translators. The DoD Privilege Team is charged with representing and protecting the interests of the United States Government related to security and threat information. The DoD Privilege Team is authorized to review all communications specified in this order, including written communications and other materials sent from Petitioner's Counsel to the Detainee. The DoD Privilege Team may not disclose a communication from Petitioner's Counsel to the Detainee other than information provided in a filing with the court and served on Government counsel, unless the disclosure of such information is authorized by this or another order of the court or by Petitioner's Counsel.

B. The DoD Privilege Team may redact or screen out material not meeting the definition of "Legal Mail" in section 3(I) above.

C. When the DoD Privilege Team proposes to redact or screen out material sent from Petitioner's Counsel to a Detainee, Petitioner's Counsel for that Detainee must be notified.

D. In the event a dispute regarding the screening and redaction of material from legal mail sent from Petitioner's Counsel to a Detainee cannot be resolved by the parties and Petitioner's Counsel seeks the intervention of this court, the DoD Privilege Team may disclose the material at issue to the Commander, JTF–Guantánamo Naval Base, or his representatives, including counsel for the Government.

E. "Special Litigation Team" is authorized to represent the DoD Privilege Team with respect to execution of its duties. The Special Litigation Team will be composed of one or more attorneys from the Department of Justice, who may not take part or be involved in litigating the merits of this action under the Detainee Treatment Act or any other case brought by or against the Detainee.

F. The DoD Privilege Team may, through the Special Litigation Team (see § 4(H) below), inform the court of any issues or problems related to the release or processing of information related to this case.

G. The Special Litigation Team may not disclose information provided by the

DoD Privilege Team or any information submitted by Petitioner's Counsel to the DoD Privilege Team for review, except as provided by this Order or as permitted by Petitioner's Counsel or by the court.

H. Petitioner's Counsel or the Special Litigation Team may submit filings to the court concerning the DoD Privilege Team or actions taken by it.

I. Until otherwise notified, potentially privileged information in such filings must be submitted to the court under seal and contain a conspicuous notation as follows: "Submitted Under Seal–Contains Privileged Information." To maintain such information under seal, an appropriate application must be made to the court. Such information must be maintained under seal unless and until the court determines the information should not be sealed. Such filings by Petitioner's Counsel or the Special Litigation Team may not be served on counsel for respondent, except as authorized by Petitioner's Counsel or the court. With respect to a submission made under seal, a redacted version suitable for filing in the public record must be provided. Unresolved disputes concerning such redacted versions may be presented to the court.

J. Petitioner's Counsel may not convey to a Detainee information redacted or screened by the DoD Privilege Team or designated for such redaction or screening, absent consent from the DoD Privilege Team, the Special Litigation Team, or the Government, or authorization by this court.

**5. Access to Classified Information and Documents**

A. Without authorization from the Government, neither Petitioner nor Petitioner's Counsel may have access to any classified information involved in this case.

B. Petitioner's Counsel is presumed to have a "need to know" all the information in the Government's possession concerning the Detainee he represents. This presumption is overcome to the extent the Government seeks to withhold from Petitioner's Counsel highly sensitive information or information concerning a highly sensitive source that the Government presents to the court ex parte and in camera. Except for good cause shown, the Government must provide notice to Petitioner's Counsel on the same day it files such information with the court ex parte.

C. Petitioner's Counsel to be provided access to classified information must execute the Memorandum of Understanding ("MOU") appended to this Protective Order, file executed originals with the court, and submit copies to the CSO and counsel for the Government. The execution and submission of the MOU is a condition precedent for Petitioner's Counsel to have initial and continuing access to classified information for the purposes of this proceeding.

D. The substitution, departure, or removal of Petitioner's Counsel from these cases for any reason will not release that person from the provisions of this Protective Order or the MOU executed in connection with this Order.

E. Authorization from the Government to access classified information will not be granted to Petitioner's Counsel unless Petitioner's Counsel has first:

i. received the necessary security clearance as determined by the Department of Justice;

ii. obtained either (a) written evidence of authority to represent the Detainee or (b) evidence of authority to represent the Detainee through the Detainee's next friend; and

iii. signed the MOU attached hereto as Exhibit A, agreeing to comply with the terms of this Protective Order.

F. Prospective counsel for a Detainee may have up to two visits with a Detainee to obtain his authorization to seek review of the CSRT's determination of his status.

G. The substitution, departure, or removal of Petitioner's Counsel from this case for any reason will not release that person from the provisions of this Protective Order.

H. Except as provided herein, Petitioner's Counsel may not disclose any classified or protected information to any person. Petitioner's Counsel may not disclose classified or protected information to a Detainee, unless that information was obtained in the first instance from the Detainee.

I. disclosure of classified information includes any knowing, willful, or negligent action that could reasonably be expected to result in a communication or physical transfer of classified information.

J. Neither Petitioner nor Petitioner's Counsel may disclose or cause to be disclosed in connection with this case any information known or believed to be classified except as otherwise provided herein.

K. At no time, including anytime subsequent to the conclusion of this case, may Petitioner's Counsel make any public or private statements disclosing any classified information made available pursuant to this Protective Order, including the fact that any such information is classified.

L. Petitioner's Counsel is required to treat all information learned from a Detainee, including any oral or written communication with a Detainee, as classified information, unless and until the information is submitted to the DoD Privilege Team or counsel for the Government and determined to be nonclassified. All classified material must be handled, transported, and stored in a secure manner, as provided by Executive Order 12958, DOD Regulation 5200.1–R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

M. Petitioner's Counsel or the DoD Privilege Team must disclose to Government counsel or Commander, JTF–Guantánamo Naval Base, any information learned from a Detainee involving any future event that threatens national security or is likely to involve violence. In such case, the Privilege Team must provide contemporaneous notice to Petitioner's Counsel and retain for Petitioner's Counsel a copy of the material provided to Government counsel or Commander, JTF–Guantánamo Naval Base.

N. Petitioner's Counsel may not disclose the contents of any classified documents or information to any person, except those authorized pursuant to this Protective Order, the court, and counsel for the Government with the appropriate clearances and the need to know that information.

O. In the event that classified information enters the public domain, counsel is not precluded from making private or public statements about the information already in the public domain, but only where the statements are not subject to the limitation set forth below. Counsel may not make any public or private statements revealing

personal knowledge from non-public sources regarding the classified or protected status of the information or disclosing that counsel had personal access to classified or protected information confirming, contradicting, or otherwise relating to the information already in the public domain. In an abundance of caution and to help ensure clarity on this matter, the court emphasizes that counsel must not be the source of any classified or protected information entering the public domain.

P. The foregoing does not prohibit Petitioner's Counsel from citing or repeating information in the public domain that Petitioner's Counsel does not know or have reason to believe to be classified information or a classified document, or derived from classified information or a classified document.

## 6. Secure Storage of Classified Information

A. The CSO will arrange for one appropriately secure area for the use of Petitioner's Counsel. The secure area must contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the Petitioner's case. Expenses for the secure area and its equipment will be borne by the Government.

B. The CSO will establish procedures to ensure that the secure area is accessible to Petitioner's Counsel during normal business hours and at other times on reasonable request as approved by the CSO. The CSO will establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information. The CSO or CSO designee may place reasonable and necessary restrictions on the schedule of use of the secure area in order to accommodate appropriate access to all Petitioners' Counsel in this and other proceedings.

C. All classified information provided by the Government to Petitioner's Counsel, and all classified information otherwise possessed or maintained by Petitioner's Counsel, must be stored, maintained, and used only in the secure area.

D. No documents containing classified information may be removed from the secure area unless authorized by the CSO or CSO designee supervising the area.

E. Consistent with other provisions of this Protective Order, Petitioner's Counsel will have access to the classified information made available to him or her in the secure area and be allowed to take notes and prepare documents with respect to those materials.

F. Petitioner's Counsel may not copy or reproduce any classified information in any form, except with the approval of the CSO or in accordance with the procedures established by the CSO for the operation of the secure area.

G. All documents prepared by Petitioner's Counsel that do or may contain classified information (including without limitation notes taken and memoranda prepared by counsel and pleadings and other documents intended for filing with the court) must be transcribed, recorded, typed, duplicated, copied, and otherwise prepared only by persons who have received an appropriate approval for access to classified information. Such activities must take place in the secure area on approved word processing equipment and in accordance with the procedures approved by the CSO. All such documents and any associated materials

containing classified information (such as notes, memoranda, drafts, copies, typewriter ribbons, magnetic recordings, exhibits) must be maintained in the secure area unless and until the CSO advises that those documents or associated materials are unclassified in their entirety. None of these materials may be disclosed to counsel for the Government unless authorized by the court, by Petitioner's Counsel, or as otherwise provided in this Protective Order.

H. Petitioner's Counsel may discuss classified information only within the secure area or in another area authorized by the CSO, may not discuss classified information over any standard commercial telephone instrument or office intercommunication system, and may not transmit or discuss classified information in electronic mail communications of any kind.

I. The CSO or CSO designee may not reveal to any person the content of any conversations she or he may hear by or among Petitioners' Counsel, nor reveal the nature of documents being reviewed by them, or the work generated by them, except as necessary to report violations of this Protective Order to the court or to carry out their duties pursuant to this Order. In addition, the presence of the CSO or CSO designee will not operate as a waiver of, limit, or otherwise render inapplicable the attorney-client privilege or work product protections.

J. All documents containing classified information prepared, possessed or maintained by, or provided to, Petitioner's Counsel (except filings submitted to the court and served on counsel for the Government), must remain at all times in the control of the CSO for the duration of these cases.

K. As stated in more detail in Section 9 below, failure to comply with these rules may result in the revocation of counsel's security clearance, civil liability, criminal liability, or any combination thereof.

7. **Access to Protected Information**

A. The Government may apply to the court to deem any information "protected," and if filed in this court to be maintained under seal. Such information must be maintained under seal unless and until the court determines the information should not be designated as "protected."

B. Without authorization from the Government or the court, protected information may not be disclosed or distributed to any person or entity other than the following:

  i. Petitioner's Counsel and counsel bound by the terms of this protective order in a case filed on behalf of another Detainee seeking review under the Detainee Treatment Act,

  ii. the court and its support personnel, and

  iii. a Detainee if the information was obtained in the first instance from the Detainee.

C. Neither Petitioner nor Petitioner's Counsel may disclose or cause to be disclosed any information known or believed to be protected in connection with any hearing or proceeding in this case except as otherwise provided herein.

D. At no time, including any period subsequent to the conclusion of the proceedings, may Petitioner's Counsel make any public or private statements disclosing any protected information made available pursuant to this Protective Order, including the fact that any such information is protected.

E. Protected information may be used only for purposes directly related to this case and not for any other litigation or proceeding, except by leave of the court. Photocopies of documents containing such information may be made only to the extent necessary to facilitate the permitted use hereunder.

F. Nothing in this Protective Order prevents the Government from using for any purpose protected information it provides to a party. Nothing in this Protective Order entitles a nonparty to this case to protected information.

G. Within ninety (90) days of the resolution of this action and the termination of any certiorari review therefrom, all protected documents and information, and any copies thereof, provided to Petitioner's Counsel must be promptly destroyed and Petitioner's Counsel must certify in writing that all designated documents and materials have been destroyed. Counsel for the Government may retain one complete set of any such materials that were presented in any form to the court. Any such retained materials must be placed in an envelope or envelopes marked "Protected Information Subject to Protective Order." In any subsequent or collateral proceeding, a party may seek discovery of such materials from the Government, without prejudice to the Government's right to oppose such discovery or its ability to dispose of the materials pursuant to its general document retention policies.

H. The Record on Review must be provided to Petitioner's Counsel at the time the certified index of the record is filed in this court or as otherwise ordered by the court.

8. **Procedures for Filing Documents**

A. Until further order of this court, any pleading or other document filed by Petitioner that Petitioner's Counsel does not believe contains classified information must be marked "Pending Classification Review," filed directly with the court, and immediately served upon Government counsel. Government counsel must accept service via hand or overnight mail. Counsel for the Government must promptly examine the pleading or other document and forward it to the appropriate agencies for their determination whether the pleading or other document contains classified information. The court will secure the document until such a determination is rendered. If it is determined that the pleading or other document does not contain classified information, Government counsel will promptly so notify the court and Petitioner's Counsel. Should a determination be made that the pleading or other document contains classified information, Government counsel will immediately notify the court of the determination so that the document may be filed under seal and maintained appropriately. Government counsel will also notify Petitioner's Counsel and the CSO. The CSO will work with Petitioner's Counsel to ensure that any classified information that may have been inadvertently processed outside of the secure facility is appropriately secured. Government counsel will work with the appropriate government agencies and departments to prepare a redacted version of the pleading or other document appropriate for filing on the public record.

B. Any pleading or other document filed by Petitioner that Petitioner's Counsel knows to be classified, believes may be

classified, or is unsure of the proper classification, must be filed under seal with the CSO at the secure facility. The pleading or other document must be marked "secret" or "top secret" as appropriate. Petitioner's Counsel will provide the original pleading and six copies thereof to the CSO. The date and time of physical submission to the CSO will be considered the date and time of filing. The CSO must immediately email the court's Guantanamo Notification List that a filing has been received. The CSO will then deliver to the court and counsel for the Government any pleading or other document filed by Petitioner that contains classified or presumptively classified information. The CSO must promptly examine the pleading or other document and forward it to the appropriate government agencies and departments for their determination as to whether the pleading or other document contains classified information. If it is determined that the pleading or other document contains classified information, the CSO must ensure that the document is marked with the appropriate classification marking and that the document remains under seal. Government counsel will work with the appropriate government agencies or departments to prepare a redacted version of the pleading or other document appropriate for filing on the public record. If it is determined that the pleading or other document does not contain classified information, Government counsel will promptly so notify the court and Petitioner's Counsel, and the Clerk will direct the parties to file a public version without any classification markings. Any deliberate mishandling of classified information could result in the revocation of counsel's security clearance, sanction by the court, or both.

C. Any pleading or other document filed by the Government containing classified information must be filed under seal with the court through the CSO. The date and time of physical submission to the CSO will be considered the date and time of filing with the court. The CSO must serve a copy of any classified pleadings by the Government upon the Petitioner at the secure facility.

## 9. Penalties for Unauthorized Disclosure

A. Any disclosure of classified information in violation of this order may constitute violations of United States criminal laws. In addition, any violation of the terms of this Protective Order must be immediately brought to the attention of the court and may result in a charge of contempt of court and possible referral for criminal prosecution. *See, e.g.,* Executive Order 12958, as amended. Any breach of this Protective Order may also result in the termination of access to classified information and protected information. Persons subject to this Protective Order are advised that direct or indirect unauthorized disclosure, retention, or negligent handling of classified documents or information could cause damage to the national security of the United States and may be used to the advantage of an adversary of the United States or against the interests of the United States. Persons subject to this Protective Order are also advised that direct or indirect unauthorized disclosure, retention, or negligent handling of protected documents or information could risk the security of United States Government personnel, United States Government facilities, and other significant United States Government in-

terests. This Protective Order is to ensure that those authorized to receive classified information or protected information will not divulge this information to anyone who is not authorized to receive it, without prior written authorization from the original classification authority and in conformity with this Protective Order.

B. The termination of these proceedings will not relieve any person or party provided classified information or protected information of his, her, or its obligations under this Protective Order.

Exhibit A

## MEMORANDUM OF UNDERSTANDING REGARDING ACCESS TO CLASSIFIED NATIONAL SECURITY INFORMATION

Having familiarized myself with the applicable statutes, regulations, and orders related to, but not limited to, unauthorized disclosure of classified information, espionage and related offenses; The Intelligence Identities Protection Act, 50 U.S.C. § 421; 18 U.S.C. § 641; 50 U.S.C. § 783; 28 C.F.R. § 17 et seq.; and Executive Order 12958, I understand that I may be the recipient of information or documents that belong to the United States and concern the present and future security of the United States, and that such documents and information together with the methods and sources of collecting it are classified by the United States Government. In consideration for the disclosure of classified information or documents:

(1) I agree that I will never divulge, publish, or reveal either by word, conduct, or any other means such classified documents and information unless specifically authorized in writing to do so by an authorized representative of the United States Government, or as expressly authorized by the Protective Order entered in the case captioned _____.

(2) I agree that this Memorandum of Understanding and any other non-disclosure agreement signed by me will remain forever binding on me.

(3) I have received, read, and understand the Protective Order entered by the court in the case captioned _____, and I agree to comply with the provisions thereof.