**Haji BISMULLAH a/k/a Haji Bismillah, and a/k/a Haji Besmella, Haji Mohammad Wali, Next Friend of Haji Bismullah, Petitioners**

v.

**Robert M. GATES, Secretary of Defense, Respondent.**

**Huzaifa Parhat, et al., Petitioners**

v.

**Robert M. Gates, Secretary of Defense, et al., Respondents.**

**Abdusabour, Petitioner**

v.

**Robert M. Gates, U.S. Secretary of Defense, et al., Respondents.**

**Abdusemet, Petitioner**

v.

**Robert M. Gates, U.S. Secretary of Defense, et al., Respondents.**

---

Jalal Jalaldin, Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense, et al., Respondents.

Khalid Ali, Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense, et al., Respondents.

Sabir Osman, Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense*, et al., Respondents.

Hammad, Petitioner

v.

Robert M. Gates, Secretary of Defense and Wade F. Davis, Colonel, USA, Respondents.

Nos. 06–1197, 06–1397, 07–1508, 07–1509, 07–1510, 07–1511, 07–1512, 07–1523.

United States Court of Appeals, District of Columbia Circuit.

Feb. 1, 2008.

John Barnaby Missing, Debevoise & Plimpton, LLP, Washington, DC, Jennifer Rose Cowan, Jeffrey Ira Lang, Jill Van Berg, Debevoise & Plimpton LLP, New York, NY, for Petitioners.

Robert Mark Loeb, Douglas N. Letter, Litigation Counsel, August Edward Flentje, Jonathan Fredrick Cohn, Peter Douglas Keisler, Gregory George Katsas, U.S. Department of Justice, Washington, DC, for Respondents.

Before: GINSBURG, Chief Judge, and SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, GARLAND, BROWN, GRIFFITH, and KAVANAUGH, Circuit Judges.

Circuit Judges SENTELLE, HENDERSON, RANDOLPH, BROWN, and KAVANAUGH would grant the petition for rehearing en banc.

A separate statement concurring in the denial of rehearing en banc filed by Chief Judge GINSBURG, with whom Circuit Judges ROGERS, TATEL, and GRIFFITH join, is attached.

A separate statement concurring in the denial of rehearing en banc filed by Circuit Judge GARLAND is attached.

A separate statement dissenting from the denial of rehearing en banc filed by Circuit Judge HENDERSON, with whom Circuit Judges SENTELLE, RANDOLPH, and KAVANAUGH join, is attached.

A separate statement dissenting from the denial of rehearing en banc filed by Circuit Judge RANDOLPH, with whom Circuit Judges SENTELLE, HENDERSON, and KAVANAUGH join, is attached.

A separate statement dissenting from the denial of rehearing en banc filed by Circuit Judge BROWN is attached.

### ORDER

PER CURIAM.

Respondents' petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing and the motion to expedite review of the petition for rehear-

ing en banc and any subsequent proceedings; the motion for leave to file ex parte/in camera top secret-SCI declarations for judges' review only and the joint opposition thereto; and the letters filed pursuant to Federal Rule of Appellate Procedure 28(j), it is

**ORDERED** that the petition for rehearing en banc be denied. It is

**FURTHER ORDERED** that the motion to expedite be dismissed as moot. It is

**FURTHER ORDERED** that the motion for leave to file ex parte/in camera top secret-SCI declarations for judges' review only be granted.

GINSBURG, Chief Judge, with whom Circuit Judges ROGERS, TATEL, and GRIFFITH join, concurring in the denial of rehearing en banc:

The panel that heard this case held that "the record on review must include all the Government Information," which the controlling DoD Regulations define as "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." *Bismullah v. Gates (Bismullah II)*, 503 F.3d 137, 138–39 (D.C.Cir. 2007); *Bismullah v. Gates (Bismullah I)*, 501 F.3d 178, 185–86 (D.C.Cir.2007); E–1 § E(3). In his dissent from the court's denial of rehearing *en banc*, Judge Randolph says of the panel's ruling that it "is contrary to the rule and the statute governing the contents of the record in cases such as these, it violates the restrictions on

our jurisdiction in the Detainee Treatment Act [ (DTA), Pub.L. No. 109–148, § 1005(e)(2), 119 Stat. 2680, 2742–43 (Dec. 30, 2005) (codified as amended at 10 U.S.C. § 801 note) ], and it risks serious security breaches for no good reason." Stmt. of Randolph, J., at 1302. Like Judge Randolph, I would not ordinarily write a separate opinion on a denial of rehearing *en banc*, but his suggestion that the panel's decision was not only erroneous but also dangerous should not go unremarked.

Judge Randolph contends that 28 U.S.C. § 2112(b) and Federal Rule of Appellate Procedure 16(a), which implements § 2112(b), "make crystal clear that ... the record does not include information never presented to the Combatant Status Review Tribunal" (CSRT).[1] Stmt. of Randolph, J., at 1303. Section 2112(b) states: "The record to be filed in the court of appeals ... shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency, board, commission, or officer concerned." *Accord* FED. R.APP. P. 16(a). The term "agency," in turn, "includes any department, independent establishment, commission, administration, authority, board or bureau of the United States ... unless the context shows that such term was intended to be used in a more limited sense." 28 U.S.C. § 451. Judge Randolph asserts that § 2112(b) applies to our review pursuant to the DTA of a CSRT's status determination because a CSRT is within a military department and a "military department is a 'department' under

---

1. Judge Randolph also implies the panel ignored the provisions of the DoD Regulations that define the "Record of Proceedings" before the CSRT, namely, E–2 § C(8) & (10). In fact, the panel not only epitomized both E–2 § C(8) and E–2 § C(10), *see Bismullah I*, 501 F.3d at 182; *see also Bismullah II*, 503 F.3d

at 139 (citing E–2 § C(8)), it expressly rejected the Government's contention that the Record of Proceedings constitutes the record on review for reasons stated in the panel's two opinions. *See Bismullah I*, 501 F.3d at 184–86; *Bismullah II*, 503 F.3d at 139–41.

§ 451, and thus an 'agency' under § 2112(b)." Stmt. of Randolph, J., at 1303.

Section 2112(b) does not define the record on review of a CSRT proceeding because a military department is not an agency under 28 U.S.C. § 451. Several provisions of Title 28 distinguish between an "agency" and a "military department," which necessarily implies that a military department is not an agency. *See* 28 U.S.C. § 530D(e) ("executive agencies and military departments"); 28 U.S.C. § 530C(b)(L)(iv) ("executive agency or military department"); 28 U.S.C. § 530D(d) ("executive agency or military department"); *cf.* 28 U.S.C. § 2671 (defining "[f]ederal agency" specifically to include "the military departments" for purposes of certain sections of Title 28 that have no bearing upon § 2112).[2]

Judge Randolph dismisses these provisions on the ground that in them the term "agency" is always modified by "executive" or "federal," which suggests a more limited conception of "agency" there than in § 451, where it appears without modification. Stmt. of Randolph, J., at 1303. For confirmation, he points to § 2 of the Administrative Procedure Act, 5 U.S.C. § 551(1)(F), which excludes "courts martial and military commissions" from the definition of "agency" for purposes of that Act. Stmt. of Randolph, J., at 1303 & n. 3. Judge Randolph seems to believe that by defining "agency" broadly and then excluding courts martial and military commis-

sions, the APA implies that courts martial and military commissions are agencies except where "expressly excluded"; because Title 28, unlike the APA, does not expressly exclude courts martial and military commissions from its scope, courts martial and military commissions are presumably agencies for purposes of that title, including §§ 451 and 2112.

This reasoning tells us nothing about a CSRT, however, unless a CSRT is a court martial or military commission, which it assuredly is not. *See* 10 U.S.C. § 802 (specifying persons subject to court martial); 10 U.S.C. § 817 (defining jurisdiction of court martial); 10 U.S.C. §§ 877–934 (enumerating substantive offenses that may be tried before a court martial); *see* 10 U.S.C. § 948b(f) (defining "military commission"); 10 U.S.C. § 948d(c) (distinguishing military commission from CSRT); *compare* DTA § 1005(e)(2) ("Review of decisions of combatant status review tribunals of propriety of detention") *with* DTA § 1005(e)(3) ("Review of final decisions of military commissions").[3] Not coming within any exclusion from the APA, therefore, a CSRT must be either an agency subject to the APA or, as I believe it is, something *sui generis* and outside the contemplation of the APA. If a CSRT were an agency subject to the APA, then the detainees at Guantánamo would presumably be entitled to the significant procedural rights afforded by the APA. The notion that a CSRT is

---

2. *See W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 88–92, 100–01, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (holding "attorney's fees" and "expert fees" distinct for purposes of 42 U.S.C. § 1988 because "[i]f ... the one includes the other, dozens of statutes referring to the two separately become an inexplicable exercise in redundancy").

3. Judge Randolph says 5 U.S.C. § 551 also expressly excludes "other military authorities." Stmt. of Randolph, J., at 1303 n. 3. In

fact, the exclusion is for "military authority exercised in the field in time of war or in occupied territory." 5 U.S.C. § 551(1)(G). Citing his own concurring opinion in *Al Odah v. United States*, 321 F.3d 1134, 1149 (D.C.Cir.2003), Judge Randolph argues a CSRT is a military authority exercised in the field in a time of war. Stmt. of Randolph, J., at 1303 n. 3. No court has ever so held and, in any event, no party to this case has suggested as much.

subject to the APA is completely inconsistent with the Congress' understanding when, by enacting the DTA, it ratified the procedural framework for CSRTs established by the DoD Regulations. In summary, a CSRT can be structured as it is under the DoD Regulations only because it is not a court martial, not a military commission, and not an agency.[4]

It would be particularly untoward to apply § 2112(b) outside its apparent field of application—and particularly improbable the Congress so intended—when the result would be to preclude the court from discharging the review function assigned to it in the DTA. That review function is broader than Judge Randolph suggests. The DTA charges the court with reviewing not only "whether ... the conclusion of the Tribunal [was] supported by a preponderance of the evidence," but also whether it was reached in a manner "consistent with the standards and procedures specified by the Secretary of Defense" for CSRTs. DTA § 1005(e)(2)(C).

The DoD Regulations, which establish the "standards and procedures" to be followed by the Recorder, the detainee's Personal Representative, and the CSRTs themselves, require the Recorder to obtain all the Government Information, E–1 § C(2); E–2 § C(1), to cull from the Government Information and forward to the Tribunal such information "as may be sufficient to support the detainee's classification as an enemy combatant" together with all exculpatory information, E–1 § H(4); E–2 §§ B(1), C(6), and to share all the Government Information with the detainee's Personal Representative, E–1 § F(8); E–2 § C(4). In order to review whether the Recorder performed these tasks, the court obviously must see all the Government Information.[5] See *Bismullah I*, 501 F.3d at 185–86; *Bismullah II*, 503 F.3d at 139–40. Further, the court will be able to assess whether any failure by the Recorder to perform these tasks affected the weight of the evidence before the CSRT only if the court can consider that failure in light of all the information the Recorder was supposed to collect and forward. See *Bismullah I*, 501 F.3d at 185–86; *Bismullah II*, 503 F.3d at 139–40. Irrespective, therefore, of what § 2112 might say in general about the scope of a record on review, the DTA requires that the record

4. Of course, if a CSRT were a court martial or a military commission, then the detainees would be entitled to greater procedural rights than they have under the DoD Regulations. *See* 10 U.S.C. §§ 830–876b (defining procedures for court martial); 10 U.S.C. §§ 948q–950j (defining procedures for military commission).

5. The record before the court suggests the Recorder has not always fulfilled his obligations under the DoD Regulations. *See* Decl. of Stephen Abraham, Lieutenant Colonel, U.S. Army Reserve ¶¶ 5–19 (June 15, 2007) (stating "the information comprising the Government Information and the Government Evidence was not compiled personally by the CSRT Recorder;" "on a number of occasions" his request that an originating agency provide "a written statement that there was no exculpatory evidence ... [was]

summarily denied;" the people "preparing materials for use by the CSRT board members did not know whether they had examined all available information or even why they possessed some pieces of information but not others;" and "the case writer or Recorder, without proper experience or a basis for giving context to information, often rejected some information arbitrarily while accepting other information without any articulable rationale"); Decl. of James M. McGarrah, Rear Admiral (Ret.), U.S. Navy ¶¶ 4–6, 10–13 (May 31, 2007) (stating that after September 1, 2004 the Recorder did not "personally collect[ ] the Government Information" and that the Recorder withheld from the Tribunal exculpatory Government Information if in his view it was "duplicative" or "if it did not relate to a specific allegation being made against the detainee").

on review of a CSRT's status determination include all the Government Information, regardless whether it was all put before the Tribunal.

Judge Randolph lodges two pragmatic objections to this analysis. First, he argues "it is impossible for us to determine whether any particular piece of information was obtained or was not obtained by any particular Recorder in any particular detainee's case" because "Recorders ... did not save the information they obtained unless" they forwarded it "to the Tribunal." Stmt. of Randolph, J., at 1304. Judge Randolph is correct—which is why the panel held the Government could either "reassemble the Government Information it did collect or ... convene a new CSRT." *Bismullah II,* 503 F.3d at 141–42.[6]

Second, Judge Randolph argues that "at most ... the record on review should consist only of the evidence before the Tribunal plus any exculpatory information the government has discovered." Stmt. of Randolph, J., at 1305. Of course, the Recorder is supposed to forward *all* the exculpatory Government Information to the Tribunal. *See* E–1 § H(4); E–2 §§ B(1), C(6). But the court is no more able than the CSRT itself to determine whether the Recorder withheld any exculpatory Government Information from the CSRT—unless, that is, subject to the national security limitations discussed below, counsel may see and draw the attention of the court to any arguably exculpatory Government Information the Recorder did not put before the Tribunal. *See* Decl. of Stephen Abraham, Lieutenant Colonel, U.S. Army Reserve ¶¶ 10–17 (June 15, 2007) ("asked to

confirm and represent in a statement to be relied upon by the CSRT board members that the [originating intelligence] organizations did not possess 'exculpatory information' relating to [detainees who were] the subject of the CSRT, ... [I could not] reach [such] a conclusion ... without knowing that I had seen all information, [but I] was never told that the information that was provided [to me by the originating organizations] constituted all available information").

One need not impute to the Recorder negligence much less bad faith to see that the DTA requires the court to review his adherence to the DoD Regulations. Because the DoD Regulations assign to the Recorder a central role in the CSRT process, to ignore the actions of the Recorder—and especially to ignore the evidence the Recorder did not put before the Tribunal—would render utterly meaningless judicial review intended to ensure that status determinations are made "consistent with" the DoD Regulations. DTA § 1005(e)(2)(C). Unlike the final decision rendered in a criminal or an agency proceeding, which is the product of an open and adversarial process before an independent decisionmaker, a CSRT's status determination is the product of a necessarily closed and accusatorial process in which the detainee seeking review will have had little or no access to the evidence the Recorder presented to the Tribunal, little ability to gather his own evidence, no right to confront the witnesses against him, and no lawyer to help him prepare his case, and in which the decisionmaker is employed and chosen by the detainee's accuser. *See* E–1 §§ A, B, C(1), C(3), E(2),

---

**6.** The Government is reportedly now "review[ing] ... whether to conduct new hearings" out of concern that it may not have "take[n] everything into consideration when [it] did the original" CSRTs. William Glaber-

son, *New Detention Hearings May Be Considered,* N.Y. TIMES, Oct. 14, 2007 (quoting Capt. Theodore Fessel, Jr.), *available at* http://www.nytimes.com/2007/10/14/us/14cnd-gitmo.html.

E(4), F, G(2), G(8), G(9), H(7).[7] As a result, the Recorder's failure to adhere to the DoD Regulations can influence the outcome of the proceeding to a degree that a prosecutor or an agency staff member cannot; as a practical matter, the Recorder may control the outcome. For this court to ignore that reality would be to proceed as though the Congress envisioned judicial review as a mere charade when it enacted the DTA. Thus, the analogy Judge Henderson draws between our review of status determinations under the DTA and our review of agency decisions, Stmt. of Henderson, J., at 1300–01, is inapt.

Judge Henderson's comparison of a status determination proceeding before a CSRT to a probable cause hearing for a criminal defendant is likewise wide of the mark. She asks, "If we can determine whether the preponderance of the evidence supports a probable cause finding sufficient to hold an arrestee for trial without knowing (much less, reviewing) all the evidence in the prosecutor's possession, can we not do so in reviewing the evidence supporting the 'enemy combatant' designation?" Stmt. of Henderson, J., at 1300. The critical question, however, is not whether it is possible for the court to review the determination of a CSRT based solely upon the evidence that was before the CSRT, but whether that would be the presumably meaningful review the Congress prescribed. Note also that a panoply of constitutional and statutory protections ensures that a person imprisoned after a probable cause hearing will receive a speedy trial and be convicted or released, thereby mitigating the impact of an erroneous finding of probable cause predicated upon limited and possibly one-sided evidence. In contrast, the determination of a CSRT is only a determination of the detainee's status as an enemy combatant.[8] Thereafter, it may be that nothing prevents the Government from holding an enemy combatant "for the duration of the relevant conflict." *Hamdi v. Rumsfeld,* 542 U.S. 507, 518–21, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004)[9]; *see Boumediene v.*

---

7. The detainee obviously cannot be given access to the classified portion of the Government Information. The detainee's Personal Representative, who is "neither a lawyer nor [the detainee's] advocate," E–3 § D, is not obligated to but "may share the unclassified portion of the Government Information with the detainee." E–1 § § F(8), G(8), H(7).

8. The DoD Regulations define an enemy combatant as "an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." E–1 § B; *see also Hamdi v. Rumsfeld,* 542 U.S. 507, 518, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004): "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." The Government reportedly "hope[s] to try eventually as many as 80 of the 305 detainees at Guantánamo," William Glaberson, *Witness Names to Be Withheld From Detainee,* N.Y. TIMES, Dec. 1, 2007, *available at* http://www.nytimes.com/2007/12/

01/us/nationalspecial3/01gitmo.html, which suggests that, if the Government intends to continue holding the remaining 225 detainees, it intends to do so solely upon the basis of their status determinations.

9. The Supreme Court left open the question whether the Government may subject an enemy combatant to an "indefinite or perpetual detention." *Hamdi,* 542 U.S. at 521, 124 S.Ct. 2633 ("[W]e understand Congress' grant of authority for use of 'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles. If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel. But that is not the situation we face as of this date.") (quoting Authorization for Use of Military Force, Pub.L. No. 107–40, § 2(a), 115 Stat. 224, 224 (2001)).

*Bush,* 476 F.3d 981, 988–94 (D.C.Cir.2007) (holding alien detained as enemy combatant at Guantánamo Bay has no constitutional right to writ of habeas corpus), *cert. granted,* —— U.S. ——, 127 S.Ct. 3078, 168 L.Ed.2d 755 (2007) (No. 06–1195).

Finally, Judge Randolph raises the concern that "sharing [the Government Information] with private counsel [will] give[ ] rise to a severe risk of a security breach." Stmt. of Randolph, J., at 1305. The panel, however, accommodated, to the full extent requested by the Government, its position that certain types of Government Information cannot be disclosed to the petitioners' counsel without jeopardizing national security. The panel "provid[ed], just as the Government urged, that it may withhold from the petitioners' counsel any Government Information that is either 'highly sensitive information, or ... pertain[s] to a highly sensitive source or to anyone other than the detainee,'" as long as the Government makes the withheld information available to the court for review *in camera. Bismullah II,* 503 F.3d at 142 (quoting *Bismullah I,* 501 F.3d at 187). The panel also stressed that, under the DoD Regulations, " 'information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant' comes within the definition of Government Information only if it is 'reasonably available.'" *Bismullah II,* 503 F.3d at 141 (quoting E–1 § E(3)); *see also Bismullah I,* 501 F.3d at 180, 192. And, as the panel observed, an "originating agency" may, pursuant to the DoD Regulations, "decline[ ] to authorize [classified information] for use in the CSRT process," presumably for reasons of national security, in which case that classified information is deemed "not reasonably available" and accordingly is not Government Information. E–1 § D(2); *see Bismullah II,* 503 F.3d at 142–43. If these options are insuf-

ficient to safeguard national security, then the Secretary of Defense, to whom the DTA assigns responsibility for establishing the standards and procedures that govern CSRTs, may revise the DoD Regulations.

Judge Brown criticizes the panel's "reliance" upon the term "reasonably available" because it "provides not a process-based definition, but an abstract legal standard." Stmt. of Brown, J., at 1307. The panel, however, did not invent the "reasonably available" standard; it is a feature of the controlling DoD Regulations. Further, the "reasonably available" standard is not as open-ended as Judge Brown suggests, in important part because, as just noted, the national security agencies may withhold classified information from the Recorder, thereby rendering it "not reasonably available."

In closing, I note that the Supreme Court, in the order granting a writ of *certiorari* in *Boumediene,* stated that "it would be of material assistance to consult any decision" reached by this court in *Bismullah.* Judge Henderson contends that "we do the Supreme Court no favor by not fully considering potentially determinative matters." Stmt. of Henderson, J., at 1302 n. 6. After merits briefing, oral argument, an opinion by the panel (in which Judge Henderson joined), a petition for rehearing and a response thereto, the petitioners' post-argument letter filed pursuant to FRAP 28(j) and the Government's response thereto, and a supplemental opinion by the panel (in which Judge Henderson again joined), there can be no doubt that all the issues presented in the parties' procedural motions have been aired and fully considered.

GARLAND, Circuit Judge, concurring in the denial of rehearing en banc:

On June 29, 2007, the Supreme Court granted the detainees' petition for certio-

rari in *Boumediene v. Bush,* 476 F.3d 981 (D.C.Cir.2007). In granting that petition, the Court advised the parties that "it would be of material assistance to consult any decision in *Bismullah, et al. v. Gates,* . . . currently pending in the United States Court of Appeals for the District of Columbia Circuit," and that "supplemental briefing will be scheduled upon the issuance of any decision" in that case. *Boumediene v. Bush,* —— U.S. ——, 127 S.Ct. 3078, 168 L.Ed.2d 755 (2007). The Supreme Court heard oral argument in *Boumediene* on December 5, 2007. Were we to grant en banc review in *Bismullah,* we would plainly delay our decision and hence the Supreme Court's disposition of *Boumediene.* As delaying the latter is contrary to the interests of all of the parties, as well as to the public interest, I concur in the denial of rehearing en banc without reaching the merits.

KAREN LECRAFT HENDERSON, Circuit Judge, with whom Circuit Judges SENTELLE, RANDOLPH, and KAVANAUGH join, dissenting from the denial of rehearing en banc:

The Detainee Treatment Act of 2005 (DTA) gives exclusive jurisdiction to this Court "to determine the validity of any final decision of [the] Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." Pub.L. No. 109–148 § 1005(e)(2)(A), 119 Stat. 2680, 2742 (Dec. 30, 2005). While the DTA is not unique in this respect, to me our exclusive jurisdiction underscores the charge given to our *entire* Court to hear and weigh all issues fairly encompassed in determining the validity of the CSRT's decision. Granted, we are now only at the preliminary stage of that determination, that is, resolving procedural motions. In two respects, however, I am convinced that our entire Court should hear and consider the protective order which both sides have asked us to enter. Accordingly, I dissent from the *en banc* denial.[1]

**I. The Scope of the Record on Review.**

*Bismullah II* attempts to correct the Government's overreading of *Bismullah I*'s description of the record on review by, first, repeating the panel's reading of the Government Information (defined by DoD Regulation E–1 § E(3)) as including only information "reasonably available" (again, specified by DoD Regulation E–1 § E(3)) and, then, by concluding that "information without regard to whether it is 'reasonably available' is clearly not required by *Bismullah I.*" *Bismullah II,* 503 F.3d at 141. *Bismullah II,* however, leaves intact the panel's original conclusion that "whether the preponderance of the evidence supported the conclusion of the Tribunal, cannot be ascertained without consideration of all the Government Information." *Id.* at 140 (citing *Bismullah I,* 501 F.3d at 185–86.)

Why we are unable to *otherwise* conduct our limited review of the validity of the CSRT's decision is left largely unexplained.[2] But in the criminal context-

---

1. I note that, as a member of the panel whose original opinion issued on July 20, 2007, *Bismullah v. Gates,* 501 F.3d 178 (D.C.Cir.2007) *(Bismullah I),* and whose opinion denying the Government's petition for panel rehearing issued on October 3, 2007, *Bismullah v. Gates,* 503 F.3d 137 (D.C.Cir.2007) *(Bismullah II),* I joined both opinions. Nevertheless, as set forth hereinbelow, matters remain that were unaddressed at the panel level—matters that

may be determinative and should at least be heard and weighed by all of us.

2. *Bismullah I* does note that "the court cannot, as the DTA charges us, consider whether a preponderance of the evidence supports the Tribunal's status determination without seeing all the evidence, any more than one can tell whether a fraction is more or less than one half by looking only at the numerator and

where the protections accorded the arrestee are greater and our review is, accordingly, more searching-our Court is plainly able to review the conduct of a preliminary hearing without knowing *all* the evidence the prosecution has gathered. The reason, of course, is that the preliminary hearing is limited in scope. *Coleman v. Burnett*, 477 F.2d 1187, 1201 (D.C.Cir.1973) ("The preliminary hearing is not a minitrial of the issue of guilt, ... 'A preliminary hearing,' the Supreme Court has said, 'is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.'" (quoting *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968))). So too is the CSRT's mission: that is, at this stage, it must decide simply whether the detainee is an enemy combatant. Only if he is one can he, presumably, then be held for trial before a military commission. If we can determine whether the preponderance of the evidence supports a probable cause finding sufficient to hold an arrestee for trial without knowing (much less, reviewing) all the evidence in the prosecutor's possession, can we not do so in reviewing the evidence supporting the "enemy combatant" designation?[3] And should not all of us at least hear the arguments for and against, especially in the national security context? And espe-

cially given the showing the Government has made in both its unclassified and *ex parte* and *in camera* submissions? *Bismullah II*, 503 F.3d at 138 n. 1.

Even if we use the administrative agency analogy instead, the Supreme Court has made clear that we have no license to "create" a record consisting of more than the agency itself had before it. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Doraiswamy v. Sec'y of Labor*, 555 F.2d 832, 839–40 (D.C.Cir.1976) ("This circumscription [that review be confined to the administrative record], which the Court has consistently honored in other cases, stems from well ingrained characteristics of the administrative process. The administrative function is statutorily committed to the agency, not the judiciary. A reviewing court is not to supplant the agency on the administrative aspects of the litigation.... The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based ....") (internal citations, quotations and footnotes omitted); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793 (D.C.Cir.1984) (explaining that the record for the reviewing court is limited to "that information

---

not at the denominator." *Bismullah I*, 501 F.3d at 186.

**3.** A detainee is not a criminal defendant. "The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and practice,' are 'important incident[s] of war.'" *Hamdi v. Rumsfeld*, 542 U.S. 507, 518, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (quoting *Ex parte Quirin*, 317 U.S. 1, 28, 30, 63 S.Ct. 2, 87 L.Ed. 3 (1942)). "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking

up arms once again." *Id.* (citing Naqvi, Doubtful Prisoner–of–War Status, 84 Int'l Rev. Red Cross 571, 572 (2002) ("[C]aptivity in war is 'neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war'" (quoting decision of Nuremberg Military Tribunal, *reprinted in* 41 Am. J. Int'l L. 172, 229 (1947))); W. Winthrop, Military Law and Precedents 788 (rev.2d ed. 1920) ("'A prisoner of war is no convict; his imprisonment is a simple war measure'" (citations omitted))).

before the [agency] *at the time of [its] decision,* ... thus excluding *ex post* supplementation of the record by either side."); *Mail Order Ass'n of Am. v. U.S. Postal Serv.,* 2 F.3d 408, 433–34 (D.C.Cir. 1993) (same). Again, should we not at least hear and weigh the arguments for and against in the national security context?

## II. Detainees' Counsel's Access to Classified Government Information.

*Bismullah II* also attempts to corral the Government Information, much of which, as the Government's submissions make clear, is classified, that must be disclosed to the detainees' counsel by emphasizing the exceptions from disclosure for information that is " 'highly sensitive ... or ... pertain[s] to a highly sensitive source or to anyone other than the detainee.' " *Bismullah II,* 503 F.3d at 142 (quoting *Bismullah I,* 501 F.3d at 187) (alteration in original).[4] *Bismullah II,* however, may be unrealistically sanguine about the Government's resulting burden if the presumption is that it must disclose all Government Information except what fits within the exceptions; according to the Government's submissions, which, I submit, we are ill-equipped to second-guess, the exceptions swamp the disclosable information. *Cf. Krikorian v. Dep't of State,* 984 F.2d 461, 464 (D.C.Cir.1993).[5] But the alternative is not necessarily limited to what *Bismullah II* describes, namely, "the only solution is [for the Government] to turn over none of [the Government Information]." *Bismul-*

*lah II,* 503 F.3d at 142. If the record on review is more limited as discussed *supra,* the detainees' counsel's access likewise contracts. Again, should we not *all* consider this alternative?

We have heard by unclassified declarations from Michael V. Hayden, Director of the Central Intelligence Agency; Gordon England, Deputy Secretary of the Department of Defense; Keith Alexander, Director of the National Security Agency; Robert Mueller, Director of the Federal Bureau of Investigation; and J. Michael McConnell, Director of National Intelligence. We have heard by Secret declaration from FBI Director Mueller. And we have heard *ex parte* and *in camera* by Top Secret–SCI declarations from CIA Director Hayden and NSA Director Alexander. In the unclassified declarations, the five officials—charged with safeguarding our country while we are now at war—have detailed the grave national security concerns the *Bismullah I* holding presents. "Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Hamdi,* 542 U.S. at 531, 124 S.Ct. 2633 (citing *Dep't of Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (noting reluctance of courts "to intrude upon the authority of the Executive in military and national security affairs")). In *Hamdi,* the Government represented that "military officers who are engaged in the serious work of waging battle [will] be

4. *Bismullah I* had *"presume[d]* counsel for a detainee has a 'need to know' *all* Government Information concerning his client, not just the portions of the Government Information presented to the Tribunal." *Bismullah I,* 501 F.3d at 187 (emphases added).

5. I leave aside this Court's likely burden if we do not consider *en banc* the scope of the

Government Information disclosable to the detainees' counsel. As *Bismullah II* itself notes, "if it is true that most of the Government Information ... come[s] within an exception ..., the practical effect ... may yet be that our review ... is in large part *ex parte."* *Bismullah II,* 503 F.3d at 143 n. 7.

unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations [will] both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried under the rubble of war." *Hamdi*, 542 U.S. at 531–32, 124 S.Ct. 2633. The High Court agreed, declaring "[t]o the extent that these burdens are triggered by heightened procedures, they are properly taken into account." *Id.* at 532, 124 S.Ct. 2633. I believe our Court should likewise take these burdens into account sitting *en banc.*[6] For the foregoing reasons I dissent from the denial of rehearing *en banc* and join Judge Randolph's dissent.

RANDOLPH, Circuit Judge, with whom Circuit Judges SENTELLE, HENDERSON and KAVANAUGH join, dissenting from the denial of rehearing en banc:

It has long been my practice not to write or join opinions on denials of rehearing en banc. *See Indep. Ins. Agents of Am., Inc. v. Clarke*, 965 F.2d 1077, 1080 (D.C.Cir. 1992). I must now depart from that practice. According to affidavits of the Directors of the Central Intelligence Agency, the Federal Bureau of Investigation, and the National Security Agency and the Director of National Intelligence, the court's ruling in these cases endangers national security. The cases deserve to be reheard and reexamined by the full court. I therefore dissent from the denial, by a vote of 5 to 5, of rehearing en banc. Here are the reasons.

The panel opinion denying rehearing asserts that the agencies just mentioned and the Department of Justice, including the Solicitor General, do not understand the original opinion. We think these executive departments understand full well what the panel ordered. The government must file, as the "record" in each detainee review case, vast reams of classified information to be shared presumptively with private defense counsel, regardless whether any of this information was ever presented to the Combatant Status Review Tribunal, whose decision is the subject of judicial review. That order is contrary to the rule and the statute governing the contents of the record in cases such as these, it violates the restrictions on our jurisdiction in the Detainee Treatment Act, and it risks serious security breaches for no good reason.

The Detainee Treatment Act does not specify what shall be in the record when we review Tribunal decisions. This is understandable because a separate statute governs "the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers." 28 U.S.C. § 2112(a). Subsection (b) of this statute, and Rule 16(a) of the Federal Rules of Appellate Procedure, which is based on it, make crystal clear that—contrary to the panel's

---

**6.** I note, in granting the detainees' certiorari petition in *Boumediene v. Bush*, 476 F.3d 981 (D.C.Cir.2007), the Supreme Court advised that "[a]s it would be of material assistance to consult any decision in *Bismullah et al. v. Gates*, No. 06–1197, ... supplemental briefing will be scheduled" once our Court's decision issues. *Boumediene v. Bush*, — U.S. —, 127 S.Ct. 3078, 168 L.Ed.2d 755 (2007). *En banc* review would plainly delay our decision and thus tighten the time frame for the sup-

plemental briefing the *Boumediene* parties must submit. Nonetheless we do the Supreme Court no favor by not fully considering potentially determinative matters, including these herein discussed. Although, as Chief Judge Ginsburg lists, Stmt. of Ginsburg, C.J., at 1298, we have shuffled much paper in this case, we have yet to consider—with the benefit of briefing and oral argument—any of the issues raised by the three dissents from the *en banc* denial.

opinions—the record does not include information never presented to the Combatant Status Review Tribunal.[1] Yet neither of the panel's two opinions even mentions Rule 16(a) or § 2112(a).[2]

Chief Judge Ginsburg, in his opinion concurring in the denial of rehearing en banc, offers two explanations. The first is that several other provisions in Title 28— not applicable here—differentiate between an "executive agency" and a "military department." Stmt. of Ginsburg, C.J., at 1294. While intended to show that a Combatant Status Review Tribunal is not an "agency" for the purposes of § 2112(b), it indicates the opposite. In Title 28, "'agency' includes any department, independent establishment, commission, administration, authority, board or bureau of the United States . . . unless the context

shows that such term was intended to be used in a more limited sense." 28 U.S.C. § 451. Chief Judge Ginsburg's citations illustrate how Congress has limited "agency" in other contexts by using modifiers such as "executive" and "federal." Section 2112(b) contains no such limit. A military department is a "department" under § 451, and thus an "agency" under § 2112(b). Therefore, § 2112(b) applies to a Combatant Status Review Tribunal, which certainly falls within the ambit of the broad definition of "agency" in Title 28. The framers of the Administrative Procedure Act concluded that military commissions would be covered as "agencies," unless they were expressly excluded from the Act. 5 U.S.C. § 551(1)(F).[3]

The Chief Judge's second explanation for disregarding § 2112(b) exposes still an-

1. The statute provides that the "record to be filed in the court of appeals . . . shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, *evidence*, and proceedings *before the agency*, board, commission, or officer concerned. . . ." 28 U.S.C. § 2112(b) (italics supplied). Rule 16(a) of the appellate rules states the same. The government's merits brief not only cited Rule 16 but also discussed why the record it filed was in compliance with the rule. Respondent Br. 54–55. That discussion sufficiently alerted the panel not only to the rule but also to the statute: the Advisory Committee Notes to Rule 16 state that "[s]ubdivision (a) is based upon 28 U.S.C. § 2112(b)."

2. The Department of Defense regulation directly on point provides that the "official record of the Tribunal's decision" shall consist of: "(a) A statement of the time and place of the hearing, persons present, and their qualifications; (b) The Tribunal Decision Report cover sheet; (c) The classified and unclassified reports detailing the findings of fact upon which the Tribunal decision was based; (d) Copies of all documentary evidence presented to the Tribunal and summaries of all witness testimony. If classified material is part of the evidence submitted or considered by the Tribunal, the report will be properly marked and

handled in accordance with applicable security regulations; and (e) A dissenting member's summary report, if any." E–2 §§ (C)(10), (C)(8).

3. The Attorney General's Manual refers to courts martial, military commissions, and other military authorities as "agencies of the United States," *Attorney General's Manual on the Administrative Procedure Act* 10 (1947), and then explains that they have been "specifically exempted" from the APA in what is now 5 U.S.C. § 551(1)(F), *id.* at 12.

Chief Judge Ginsburg argues that Combatant Status Review Tribunals are *sui generis* and for that reason are exempt from the requirements of the APA. We agree that the APA exempts Combatant Status Review Tribunals, but not because they are *sui generis*. Instead, the detention of enemy combatants, and the review processes related to them, are military "functions" the APA specifically exempts. The writer's opinion in *Al Odah v. United States,* 321 F.3d 1134, 1149 (D.C.Cir.2003), attached hereto as an addendum, explains why. In any event, Chief Judge Ginsburg's argument misses the point. Our review in this case is controlled not by the APA, but by 28 U.S.C. § 2112. The Chief Judge does not explain why the broad, unmodified term "agency" in § 2112 excludes a Combatant Status Review Tribunal.

other problem with the panel's reasoning. He writes that to follow § 2112(b)'s law governing the contents of the record "would be to preclude the court from discharging the review function assigned to it in the" Detainee Treatment Act. Stmt. of Ginsburg, C.J., at 1295. What exactly is this "review function"? Apparently the idea is that the court will look at how well the Recorder did his job in gathering "Government Information" and how well he culled it in presenting the information to the Tribunal as "Government Evidence."[4]  *Id.* at 1295–97.

Forget for the moment that the Detainee Treatment Act limits our jurisdiction to review of the *Tribunal's* status determination. DTA § 1005(e)(2)(C)(i). Ignore as well that under the controlling regulations it is the Tribunal, not the court, who supervises the Recorder. E–1 § (C)(2). Even so the question remains—how does the court's order requiring the government to assemble a record consisting of all "reasonably available" information bearing on

the detainee's status enable the court to determine whether the Recorder adequately performed his job in gathering information? This is an essential question and neither the panel nor Chief Judge Ginsburg has ever given a satisfactory answer to it.

Perhaps the panel envisioned our court examining the thousands of documents[5] making up the "record" on review and seeing how much of this information escaped the Recorder's attention. But the government has pointed out the fallacy in that vision, which contemplates a comparative judgment. The Recorders, operating before Congress passed the Detainee Treatment Act, did not save the information they obtained unless it became part of the permanent record when they presented it to the Tribunal. So even if this were a proper function for our court, it is impossible for us to determine whether any particular piece of information was obtained or was not obtained by any particular Recorder in any particular detainee's case.

**4.** Under Defense Department regulations, "Government Information" is "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." E–1 § (E)(3). "Government Evidence" is "such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant." E–1 § (H)(4).

The panel did not seem to appreciate the large difference between "information" and "evidence." It stated that "whether the preponderance of the evidence supported the conclusion of the Tribunal, cannot be ascertained without consideration of all the Government Information." *Bismullah v. Gates*, 503 F.3d at 140 *(Bismullah II)*, citing *Bismullah v. Gates*, 501 F.3d 178, 186 (D.C.Cir.2007) *(Bismullah I)*. That rationale could not hold and the Chief Judge seems to have abandoned it. In legal proceedings before courts and other adjudicative bodies, the classic definition of "evidence" is "any matter of fact

which is furnished to a legal tribunal otherwise than by reasoning, as the basis of inference in ascertaining some other matter of fact." James B. Thayer, *Presumptions and the Law of Evidence*, 3 HARV. L.REV. 141, 143 (1889). Moreover, the Detainee Treatment Act, in speaking of a preponderance of the evidence, refers to "the requirement" that the Tribunal's conclusion be so supported. DTA § 1005(e)(2)(C)(i). The reference is to Defense Department regulation E–1 § (G)(11) dealing with the burden of proof. In context it is clear as a bell that the "evidence" in the regulation and in the Act means the evidence before the Tribunal, not some pile of information the Recorder decided not to present. The panel thus erred in saying that to determine whether there was enough evidence to support the Tribunal's decision, the court had to look through information the Tribunal never saw.

**5.** The government predicts that for each detainee, the record envisioned by the panel will consist of "hundreds of thousands[ ] of documents." Pet. for Rehearing 10.

The original panel opinion offered a different rationale than the one the Chief Judge now proposes. It was that the detainee's counsel would need to see Government Information "to present an argument that the Recorder withheld exculpatory information." *Bismullah I,* 501 F.3d at 185–86. But the panel's remedy far outruns this rationale. Even if one accepted the exculpatory information rationale—which would require the court to disregard § 2112(b) and Rule 16(a)—this would at most lead to a conclusion that the record on review should consist only of the evidence before the Tribunal plus any exculpatory information the government has discovered. Yet the panel has required all information, exculpatory and incriminatory alike, bearing on the detainee's status to be deposited with the court and presumptively made available to defense counsel.

Why? We can be sure that the assembled information cannot be used in our judicial review of the Tribunal's status determination. And we can also be sure that its assembly and filing in this court, and potential sharing with private counsel, gives rise to a severe risk of a security breach. That is the position of the agencies charged with protecting the country against terrorist attacks, who warn that foreign intelligence services will cease cooperating with the United States if the panel opinion stands. Their concerns deserve the attention of the full court on rehearing en banc.

One final point. Judge Garland votes against en banc, not because he thinks the case unimportant, but because he believes it is more important to advance our decision-making in order to assist the Supreme Court. Stmt. of Garland, J., at 1298–99. We think that it is more important to decide the case correctly and that a correct decision would be of more assistance to the High Court.

For the foregoing reasons we dissent from the denial of rehearing en banc.

## ADDENDUM

RANDOLPH, Circuit Judge, concurring:

\*  \*  \*

The United States or its officers may be sued only if there is a waiver of sovereign immunity. *See, e.g., Dep't of Army v. Blue Fox, Inc.,* 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999). We have held that the Alien Tort Act, whatever its meaning, does not itself waive sovereign immunity. *Industria Panificadora, S.A. v. United States,* 957 F.2d 886, 886 (D.C.Cir.1992) (per curiam); *Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 207 (D.C.Cir.1985); *see Canadian Transport Co. v. United States,* 663 F.2d 1081, 1092 (D.C.Cir.1980). The detainees therefore rely on the waiver provision in the Administrative Procedure Act, 5 U.S.C. § 702, which states: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity ... shall not be dismissed ... on the ground that it is against the United States...."

Although relying on the APA's waiver for agencies, the detainees do not identify which "agency" of the United States they have in mind. They have sued the President in each case, but the President is not an "agency" under the APA and the waiver of sovereign immunity thus does not apply to him. *See Franklin v. Massachusetts,* 505 U.S. 788, 800–01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992); *Armstrong v. Bush,* 924 F.2d 282, 289 (D.C.Cir.1991). This leaves the military. The APA specifically excludes from its definition of "agency" certain functions, among which is "mil-

itary authority exercised in the field in time of war or in occupied territory." 5 U.S.C. §§ 551(1)(G), 701(b)(1)(G); *see id.* §§ 553(a)(1) & 554(a)(4), exempting military "functions" from the APA's requirements for rulemaking and adjudication; *United States ex rel. Schonbrun v. Commanding Officer,* 403 F.2d 371, 375 n. 2 (2d Cir.1968) (Friendly, J.). The district court ruled, in an alternative holding, that because of the military function exclusion, the APA does not waive sovereign immunity. *Rasul v. Bush,* 215 F.Supp.2d 55, 64 n. 10 (D.D.C.2002). I believe this is correct.

Each of the detainees, according to their pleadings, was taken into custody by American armed forces "in the field in time of war." I believe they remain in custody "in the field in time of war." It is of no moment that they are now thousands of miles from Afghanistan. Their detention is for a purpose relating to ongoing military operations and they are being held at a military base outside the sovereign territory of the United States. The historical meaning of "in the field" was not restricted to the field of battle. It applied as well to "organized camps stationed in remote places where civil courts did not exist," *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 274, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960) (Whittaker, J., joined by Stewart, J., concurring in part and dissenting in part). To allow judicial inquiry into military decisions after those captured have been moved to a "safe" location would interfere with military functions in a manner the APA's exclusion meant to forbid. We acknowledged as much in *Doe v. Sullivan,* 938 F.2d 1370, 1380 (D.C.Cir.1991), when then-Judge Ruth Bader Ginsburg stated for the court that the APA's military function exclusion applied to cases in which a court was asked to "review military commands made . . . in the aftermath of [ ] battle." It is also of no moment that the detainees were captured without Con-

gress having declared war against any foreign state. "Time of war," as the APA uses it, is not so confined. The military actions ordered by the President, with the approval of Congress, are continuing; those military actions are part of the war against the al Qaeda terrorist network; and those actions constitute "war," not necessarily as the Constitution uses the word, but as the APA uses it. *See Campbell v. Clinton,* 203 F.3d 19, 29–30 (D.C.Cir.2000) (Randolph, J., concurring in the judgment); *Mitchell v. Laird,* 488 F.2d 611, 613 (D.C.Cir.1973). The detainees are right not to contest this point. To hold that it is not "war" in the APA sense when the United States commits its armed forces into combat without a formal congressional declaration of war would potentially thrust the judiciary into reviewing military decision-making in places and times the APA excluded from its coverage.

\* \* \*

*Al Odah v. United States,* 321 F.3d 1134, 1149–50 (D.C.Cir.2003) (Randolph, J., concurring).

BROWN, Circuit Judge, dissenting from the denial of rehearing en banc:

I appreciate the panel's efforts to clarify the Government's production burden in these CSRT reviews. The panel assumes the phrase "reasonably available" adequately defines the scope of the record because that phrase comes from the CSRT regulations. However, because the record so defined does not arise naturally from the proceedings, the panel may have left much to litigate. The Government is clearly uncertain about what information is "reasonably available," and is searching laboriously through "all relevant federal agencies" to make sure it gathers at least that much information. Pet. at 10. The panel has, naturally, refused to opine on whether the results of such an exhaustive

search are reasonably available, *Bismullah v. Gates*, 503 F.3d 137, 141 n. 3 (D.C.Cir. 2007) (denial of panel rehearing) *(Bismullah II)*, but it seems to think that too intensive a search would be unreasonable, *see id.* at 142. The panel avers that it did not require "[a] search for information without regard to whether it is 'reasonably available.'" *Id.* at 141. But reliance on this sort of verbal formulation may confuse rather than clarify the obligation. Using the phrase "reasonably available" provides not a process—based definition, but an abstract legal standard. If the Government must populate the record based on this standard, it will have to conduct a new search for materials that satisfy it. Under the panel's order, the record may be congruent with the universe of information identified by the regulations, but it bears no direct relationship to the CSRT process-or any process at all. Although the panel might have been right to reject the Government's offer of only the record that a CSRT considered, that version of the record is at least the definite product of a process that actually happened.[1] The likely result of relying on a theoretical record will be continued litigation over the inclusion or exclusion of various pieces of information, so that any review of the merits of these cases will be substantially delayed. This would be fair to neither the Government nor the detainees.

The denial of rehearing has generated five separate opinions disputing the proper scope of production; this continuing debate suggests the court has not yet found the right paradigm. Although we strain for familiar analogies to guide us, none of them is apt, because they all miss a central point: CSRTs are not adversarial proceedings. Detainees are not represented by advocates, but only by Personal Representatives whose sole duty is to assist, not defend, them. Conversely, the Recorders and the CSRTs have an obligation, under the procedures, to find and examine exculpatory evidence. That being so, it seems improbable that the Government need turn over only the Record of Proceedings compiled after the CSRT, as it originally urged, *Bismullah v. Gates*, 501 F.3d 178, 185 (D.C.Cir.2007) *(Bismullah I)*. On the other hand, to demand everything means engaging this court in *de novo* review of the CSRTs, as the panel acknowledges. *See Bismullah II*, 503 F.3d at 139–40. Is such review what Congress intended when it passed the Detainee Treatment Act?

Congress mandated this court to review the CSRTs. An adversarial appeal from a nonadversarial hearing is an unfamiliar process in this country, but it is common in other parts of the world. Indeed, since the military's prisoner-of-war procedures were developed to implement international law, Army Reg. 190–8 §§ 1–1(b)(3), 1–6(a) (citing Geneva Convention Relative to the Treatment of Prisoners of War art. 5, Aug. 12, 1949, 6 U.S.T. 3316), it is conceivable that they were intentionally modeled on traditional inquisitorial procedures. Many aspects seem similar, including the role of the Recorder as both judge and investigator. Not only does he prepare the "official record of the Tribunal's decision," Memo. from the Sec'y of the Navy on Implementation of Combatant Status Review Tribunal Procedures Encl. 2 § C(10) (July 29, 2004); he also gathers the Government Information, which includes all "reasonably

---

1. As a corollary, reconvening a CSRT, as the panel proposes, *Bismullah II*, 503 F.3d at 141, will only postpone the issue, because the abstract set of Government Information will have no relation to that proceeding either.

The court will still review whether the Recorder for the new panel gathered all reasonably available information. *Bismullah I*, 501 F.3d at 185; Stmt. of Ginsburg, C.J., at 1295–96.

available information ... bearing on ... whether the detainee" is an enemy combatant, *id.* Encl. 1 § E(3), including evidence both for and against that determination. *Cf.* JACQUELINE HODGSON, FRENCH CRIMINAL JUSTICE 30 (2005) (investigating magistrate must "gather[ ] evidence which might exculpate as well as incriminate the suspect"). Most important for this case, a civil-law inquisition prepares a well-defined record for review, consisting of the material that the magistrate actually gathered. Bron McKillop, *Anatomy of a French Murder Case,* 45 AM. J. COMP. L. 527, 544–46 (1997). Naturally, this record contains significantly less information than what the magistrate *could* have gathered because it was available.

My point is not to hold out continental criminal procedure as the perfect model for CSRT review, although it may be the closest (and may actually have been the original) model for the military's prisoner-of-war tribunals. Nor, of course, is it a source of law, although it can be a useful source of ideas given that the military's prisoner-of-war regulations expressly advert to international law. Nevertheless, this court could define the record in other ways than the "all" required by the panel or the "nothing" offered by the Government, and this definition is one of a set of decisions this court should make about how we are to conduct this novel form of review. I am now convinced we should have begun by discussing the problems much more thoroughly *en banc.* Accordingly, I dissent from the denial of rehearing.